# In The
# United States Court Of Appeals
## For The Fourth Circuit

## UNITED STATES OF AMERICA,

*Plaintiff – Appellee,*

v.

## ANITA LOUISE JACKSON,

*Defendant – Appellant.*

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### AT RALEIGH

————————————

### BRIEF OF APPELLANT

————————————

Elliot S. Abrams
CHESHIRE PARKER
  SCHNEIDER, PLLC
133 Fayetteville Street
Suite 400
Raleigh, NC 27601
(919) 833-3114
elliot.abrams@cheshirepark.com

*Counsel for Appellant*

Ripley E. Rand
WOMBLE BOND
  DICKINSON (US) LLP
555 Fayetteville Street
Suite 1100
Raleigh, NC 27601
(919) 755-8125
ripley.rand@wbd-us.com

*Counsel for Appellant*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................iv

INTRODUCTION ...........................................................................1

STATEMENT OF JURISDICTION .......................................................4

STATEMENT OF THE ISSUES ...........................................................5

STATEMENT OF THE CASE .............................................................6

    A. The FDCA Regulatory Regime ..................................6

    B. Dr. Anita Jackson .......................................................10

    C. The Device at Issue.....................................................11

    D. The Charges................................................................12

    E. Relevant Pretrial Proceedings.....................................14

    F. The Trial Theory and Rulings .....................................14

    G. The Trial Court's Denial of Dr. Jackson's Requested Jury Instructions ...........................................17

    H. The Prosecutor's Golden Rule Argument..................18

    I. Verdict and 25-Year Sentence ....................................18

SUMMARY OF ARGUMENT .............................................................20

ARGUMENT ................................................................................24

I.    THE FDCA CHARGE MUST BE VACATED.................................24

A. The FDCA charge fails to state an offense.................................25

    1. The FDCA charge is defective for failing to allege that the devices were "held for sale." ...........................................28

        a. Holding a device for sale does not include holding it for use or using it..............................................29

            i. The plain meaning of "held for sale" controls and does not include using a device or holding it for use.....29

            ii. The Ninth Circuit's decision in *United States v. Kaplan* is unpersuasive ...............................35

            iii. Equating "held for sale" with "use" or "held for use" would render Section 331(k) unconstitutionally vague ..........................................................42

    2. The FDCA charge is defective for failing to allege that Dr. Jackson was acting outside of a legitimate doctor-patient relationship.............................................44

    3. The Government's theory of *per se* adulteration is defective...................................................................45

B. The evidence was insufficient to support the FDCA conviction ..................................................................47

C. The district court erroneously prohibited Dr. Jackson from presenting a complete defense ..................................50

    1. Preventing Dr. Jackson from demonstrating her cleaning and sanitation process was reversible error ..........52

    2. Preventing Dr. Jackson from showing why she believed that reusing devices was legally appropriate was also reversible error....................................................54

D. The FDCA instructions were erroneous and prejudicial .......... 56

    1. The trial court's denial of Dr. Jackson's requested FDCA instructions requires reversal ............................................... 56

    2. The trial court's erroneous "irrelevance" instructions require vacatur .................................................................. 58

E. The Government's Golden Rule argument requires reversal ............................................................................... 62

II.    THE FOREGOING ERRORS REQUIRE REVERSAL OF ALL OF THE CONVICTIONS ............................................................. 65

III.   THE AGGRAVATED IDENTITY THEFT CHARGES AND CONVICTIONS DO NOT SURVIVE THE SUPREME COURT'S DECISION IN *DUBIN* ................................................. 69

A. The indictment failed to state an offense in light of *Dubin* ...... 70

B. The jury instructions were plainly erroneous and require reversal ..................................................................... 72

IV.   THE COURT SHOULD ASSIGN THIS CASE TO A DIFFERENT JUDGE ON REMAND ........................................... 75

CONCLUSION ........................................................................ 80

REQUEST FOR ORAL ARGUMENT ..................................................... 80

CERTIFICATE OF COMPLIANCE ....................................................... 82

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bostock v. Clayton Cnty.,*
    590 U.S. 644 (2020) ....................................................................... 27

*In re Brown,*
    932 F.3d 162 (4th Cir. 2019) ........................................................ 31

*Buckman Co. v. Plaintiffs' Legal Comm.,*
    531 U.S. 341 (2001) ............................................................. 6, 7, 46

*Caplinger v. Medtronic, Inc.,*
    784 F.3d 1335 (10th Cir. 2015) ............................................. *passim*

*Carolina Youth Action Project v. Wilson,*
    60 F.4th 770 (4th Cir. 2023) .......................................................... 42

*Chaney v. Heckler,*
    718 F.2d 1174 (D.C. Cir. 1983), *rev'd,*
    470 U.S. 821 (1985) .............................................................. *passim*

*Colautti v. Franklin,*
    439 U.S. 379 (1979), *abrogated on other grounds by*
    *Dobbs v. Jackson Women's Health Org.,*
     597 U.S. 215 (2022) ....................................................................... 43

*Connecticut v. Johnson,*
    460 U.S. 73 (1983) ......................................................................... 65

*Dubin v. United States,*
    599 U.S. 110 (2023) .............................................................. *passim*

*Earp v. Cullen,*
    623 F.3d 1065 (9th Cir. 2010) ................................................. 77, 79

*FDA v. Brown & Williamson Tobacco Corp. ("FDA v. Brown"),*
    529 U.S. 120 (2000) ..................................................... 6, 30, 32, 33

*FDIC v. Meyer,*
    510 U.S. 471 (1994) ...................................................................... 29

*Fieldman v. Brannon,*
    969 F.3d 792 (7th Cir. 2020) ........................................................ 51

*Francis v. Franklin,*
    471 U.S. 307 (1985) ...................................................................... 47

*Judge Rotenberg Educ. Ctr. v. FDA,*
    3 F.4th 390 (D.C. Cir. 2021) .......................................... 7, 24, 42, 46

*Leathers v. General Motors Corp.,*
    546 F.2d 1083 (4th Cir. 1976) .................................................. 63, 64

*Lewis v. Johnson & Johnson,*
    991 F. Supp. 2d 748 (S.D.W. Va. 2014) .......................... 8, 37, 49, 50

*Medtronic, Inc. v. Lohr,*
    518 U.S. 470 (1996) ....................................................... 7, 8, 49, 50

*N. Carolina Coastal Fisheries Reform Grp. v.*
*Capt. Gaston LLC ("N.C. Fisheries"),*
    76 F.4th 291 (4th Cir. 2023) .................................................... 32, 33

*Rock v. Arkansas,*
    483 U.S. 44 (1987) ........................................................................ 51

*Sandstrom v. Montana,*
    442 U.S. 510 (1979) ...................................................................... 47

*Santoro v. Accenture Fed. Servs., LLC,*
    748 F.3d 217 (4th Cir. 2014) ........................................................ 34

*Shcherbakovskiy v. Da Capo Al Fine, Ltd.,*
    490 F.3d 130 (2d Cir. 2007) ...................................................... 76, 79

*Strickland v. Washington,*
    466 U.S. 668 (1984) ...................................................................... 73

*United States v. 10 Cartons of Black Tablets*,
  152 F. Supp. 360 (W.D. Pa. 1957) ............................................ 40, 41

*United States v. Am. Mercantile Corp.*,
  889 F. Supp. 1058 (W.D. Tenn. 2012) ...................................... 60, 61

*United States v. Barrett*,
  982 F.2d 193 (6th Cir. 1992) ...................................................... 80

*United States v. Barringer*,
  25 F.4th 239 (4th Cir. 2022) .............................................. 65, 66, 69

*United States v. Bradley*,
  455 F.3d 453 (4th Cir. 2006) ............................................. 75, 76, 80

*United States v. Braxton*,
  784 F.3d 240 (4th Cir. 2015) ...................................................... 76

*United States v. Brewbaker*,
  87 F.4th 563 (4th Cir. 2023) ................................................. 25, 70

*United States v. Camara*,
  908 F.3d 41 (4th Cir. 2018) ........................................................ 70

*United States v. Device Labeled "Cameron Spitler Amblyo-Syntonizer,"*
  261 F. Supp. 243 (D. Neb. 1966) ............................................. 40, 41

*United States v. Diapulse Corp. of America*,
  514 F.2d 1097 (2d Cir. 1975) ...................................................... 41

*United States v. Diaz-Castro*,
  752 F.3d 101 (1st Cir. 2014) ...................................................... 63

*United States v. Evers*,
  643 F.2d 1043 (5th Cir. 1981) ............................................... 39, 40

*United States v. Facteau*,
  89 F.4th 1 (1st Cir. 2023) .................................................... 11, 46

*United States v. Ferguson,*
    752 F.3d 613 (4th Cir. 2014) ................................................. 52, 65

*United States v. Gallagher,*
    90 F.4th 182 (4th Cir. 2024)....................................... 51, 58, 67, 69

*United States v. Green,*
    599 F.3d 360 (4th Cir. 2010) ........................................................ 48

*United States v. Hasson,*
    26 F.4th 610 (4th Cir.), *cert. denied,*
    143 S. Ct. 310 (2022) ................................................................... 42

*United States v. Herron,*
    432 F.3d 1127 (10th Cir. 2005) .................................................... 63

*United States v. Ibisevic,*
    675 F.3d 342 (4th Cir. 2012) ........................................................ 66

*United States v. Jennings,*
    496 F.3d 344 (4th Cir. 2007) ........................................................ 72

*United States v. Jones,*
    60 F.4th 230 (4th Cir. 2023)......................................................... 30

*United States v. Kaplan,*
    836 F.3d 1199 (9th Cir. 2016) ............................................. *passim*

*United States v. Kingrea,*
    573 F.3d 186 (4th Cir. 2009) .................................................. 70, 71

*United States v. Lindberg,*
    39 F.4th 151 (4th Cir. 2022) ........................................................ 65

*United States v. McCall,*
    934 F.3d 380 (4th Cir. 2019) ............................................ 75, 76, 80

*United States v. Perry,*
    757 F.3d 166 (4th Cir. 2014) ............................................70-71, 72

*United States v. Regenerative Sciences, LLC,*
    741 F.3d 1314 (D.C. Cir. 2014)................................... 37, 38

*United States v. Rhody Dairy, LLC,*
    812 F. Supp. 2d 1239 (W.D. Wash. 2011) .............................. 38, 39

*United States v. Said,*
    26 F.4th 653 (4th Cir. 2022)......................................... 56

*United States v. Scotty's, Inc.,*
    173 F. Supp. 3d 549 (E.D. Mich. 2016) ........................... 60

*United States v. Smithers,*
    92 F.4th 237 (4th Cir. 2024)...................................... 56

*United States v. Sullivan,*
    332 U.S. 689 (1948) ............................... 27, 29, 30

*Util. Air Regul. Grp. v. EPA,*
    573 U.S. 302 (2014) ................................... 33

*Werner v. Upjohn Co.,*
    628 F.2d 848 (4th Cir. 1980) ................................... 62, 63

**Statutes**

18 U.S.C. § 1028A................................................. 13

21 U.S.C. § 331 ................................................. 10

21 U.S.C. § 331(a)................................... 8, 9, 10, 30

21 U.S.C. § 331(b)................................... 8, 10, 30

21 U.S.C. § 331(c) ................................... 8, 30

21 U.S.C. § 331(f)................................................. 10

21 U.S.C. § 331(g)................................................. 9

21 U.S.C. § 331(k)................................................. *passim*

21 U.S.C. § 333(a) ............................................................... 10

21 U.S.C. § 333(a)(2) ............................................. 13, 25, 27

21 U.S.C. § 333(b)(1)(B) ...................................................... 31

21 U.S.C. § 351(a)(1) ............................................................. 9

21 U.S.C. § 351(a)(2)(A) ...................................................... 26

21 U.S.C. § 351 *et seq.* ........................................................ 7

21 U.S.C. § 352 ...................................................................... 8

21 U.S.C. § 352(f) ........................................................... 31, 41

21 U.S.C. § 353(d) ............................................................... 31

21 U.S.C. § 393(b)(2) ............................................................. 6

21 U.S.C. § 396 ........................................................... *passim*

28 U.S.C. § 1291 .................................................................... 4

FDCA ........................................................................... *passim*

FDCA § 510(k) ........................................................... *passim*

UCC § 2-106(1) .................................................................... 29

## Constitutional Provisions

U.S. Const. amend. V ..................................................... 21, 71

U.S. Const. amend. VI .................................................... 21, 71

## Regulations

21 C.F.R. 801.4 ....................................................... 8, 36, 41, 45

21 C.F.R. 801.5(c) ...................................................... 8

21 C.F.R. 801.422 .................................................. 29, 41

## Rules

Fed. R. Crim. P. 12(b)(3)(B)(v) .............................. 25

## Other Authorities

FDA's Role in Regulating Medical Devices (2024),
https://www.fda.gov/medical-devices/home-use-
devices/fdas-role-regulating-medical-devices
(last accessed March 13, 2024)..................................... 33

Beck & Azari, *FDA,*
*Off–Label Use, and Informed Consent: Debunking*
*Myths and Misconceptions,*
53 Food & Drug L.J. 71,(1998)..................................... 46

Merriam-Webster.com (2023) ................................. 29

New Oxford American Dictionary 1541 (3d ed. 2010)........................... 29

# **INTRODUCTION**

When Congress enacted the Federal Food, Drug, and Cosmetic Act ("FDCA"), Congress "went out of [its] way to protect the liberty of doctors and patients to use approved devices in any manner they wish—including [contrary to] label." *Caplinger v. Medtronic, Inc.*, 784 F.3d 1335, 1344 (10th Cir. 2015) (Gorsuch, J.). Dr. Anita Jackson is serving a 25-year sentence because she used an approved device to treat her patients differently than the label instructed. The label said that the device should be used only once, but in Dr. Jackson's medical judgment, it could be cleaned and re-used. Dr. Jackson was not alone in reaching this conclusion—20-30 percent of hospitals re-use devices labeled as single-use—and there was no evidence that the sanitized devices were less effective or safe. Yet the Government prosecuted her anyway, alleging that she acted improperly by using devices contrary to their single-use label. And the district court compounded this error by prohibiting Dr. Jackson from explaining why she believed it was appropriate to re-use the devices. Thus, the jury's verdict reflected neither the facts nor the law.

This Court should reverse. The government alleged "one big scheme" to re-use devices labeled single-use, but the FDCA does not apply to Dr. Jackson's use of an approved device to treat patients, and it does not criminalize differences of opinion over medical treatment.

The numerous errors stemming from the Government's defective FDCA theory affected every count in the indictment, all of which, the Government explained, were "interwoven" with the FDCA allegations. And much of the evidence prejudicial to Dr. Jackson as to each of the other counts would be inadmissible in a trial without the FDCA count. Thus, the FDCA errors require vacatur of all convictions.

Two of those other charges were for "Aggravated Identity Theft" allegedly intended to impede the Government's FDCA investigation. After the trial, the Supreme Court issued its opinion in *Dubin v. United States*, which held that this offense requires proof that the alleged identity theft was "at the crux of what ma[de] the [underlying conduct] criminal." The indictment did not allege this fact, and the trial evidence did not support it. Accordingly, those convictions must be vacated based on *Dubin*.

Finally, throughout trial and sentencing, the district court repeatedly and forcefully expressed its opinions about the proper uses of single-use devices and Dr. Jackson's credibility—which opinions were universally unfavorable to Dr. Jackson. Based on those opinions, it sentenced Dr. Jackson to 25 years in prison. Because it is reasonable for an observer or for Dr. Jackson to question whether those opinions may influence the trial court on remand, remand to a new judge is warranted.

## STATEMENT OF JURISDICTION

This Court has jurisdiction under 28 U.S.C. § 1291. This is a direct appeal from a final judgment of the United States District Court for the Eastern District of North Carolina entering judgment of conviction and imposing a criminal sentence. The district court entered a written judgment on July 13, 2023, JA3967-3974, and an amended written judgment on September 18, 2023, JA4060-4065. Dr. Jackson timely filed notices of appeal on July 17, 2023, and September 18, 2023. JA3975-3976, JA4066-4067.

# STATEMENT OF THE ISSUES

I.     Dr. Jackson was convicted of violating the FDCA. Must that conviction be vacated because (A) the FDCA charge fails to state an offense; (B) there was insufficient evidence to convict Dr. Jackson of violating the FDCA; (C) the trial court substantially and erroneously limited Dr. Jackson's testimony in her own defense; (D) the trial court failed to correctly instruct the jury on the FDCA; and/or (E) the Government made a prohibited Golden Rule argument?

II.    Were the foregoing errors prejudicial as to the other convictions?

III.    Does *Dubin v. Unted States* require vacatur of the Aggravated Identity Theft convictions?

IV.    Is remand to a new judge warranted?

## STATEMENT OF THE CASE

The dominant theory of prosecution involved an alleged violation of the Food, Drug, and Cosmetic Act ("FDCA"). The following outlines the statutory and regulatory scheme before providing relevant case-specific background.

### A. The FDCA Regulatory Regime

In 1938, Congress enacted the FDCA to regulate the production, sale, and distribution of food, drugs, devices, and cosmetics "to ensure that any product regulated by the FDA is 'safe' and 'effective' for its intended use." *FDA v. Brown & Williamson Tobacco Corp. ("FDA v. Brown")*, 529 U.S. 120, 133 (2000) (citing 21 U.S.C. § 393(b)(2)).

Regarding drugs and medical devices, the FDCA imposes upon the Food and Drug Administration ("FDA") the obligation "to regulate in this area without directly interfering with the practice of medicine." *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350 (2001) (cleaned up). To ensure that the FDA strikes the correct balance in accomplishing this "difficult task," Congress enacted 21 U.S.C. § 396.

Section 396 is entitled "Practice of medicine" and states, in relevant part,

> Nothing in [the FDCA] shall be construed to limit or interfere with the authority of a health care practitioner to prescribe or administer any legally marketed device to a patient for any condition or disease within a legitimate health care practitioner-patient relationship.

*Buckman Co.*, 531 U.S. at 350 (quoting § 396). Thus, the FDCA does not regulate doctors' use of devices. *See, e.g., id.*; *Caplinger*, 784 F.3d at 1344 (Gorsuch, J.) (Doctors may "use approved devices in any manner they wish."); *Judge Rotenberg Educ. Ctr. v. FDA*, 3 F.4th 390, 395 (D.C. Cir. 2021) ("Section 396 constrains the FDA's authority by prohibiting it from regulating the practice of medicine.").

The FDCA seeks to ensure that medical devices on the market are safe by requiring manufacturers to submit for FDA review proposed product labels, which must accompany the device from manufacture to final purchase.[1] *See generally* § 351 *et seq.* The labels must identify the

---

[1] An important caveat is discussed at Section I.B. below. That is, that devices and device labels—such as those at issue in this case, *see* JA55 (indictment)—that are submitted through the so-called Section 510(k) process are never reviewed for safety, but instead are reviewed only for whether the device and intended use instructions are "substantially equivalent" to a device already on the market before 1976. In other words, as the Supreme Court has explained, "[t]he 510(k) process is focused on equivalence, not safety." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 493 (1996). Accordingly, courts have excluded as irrelevant and misleading evidence that devices were cleared through the Section 510(k)

device's "intended uses," including the conditions or purposes for which the device is intended to be used and whether the device is intended for single use or re-use. *See* 21 C.F.R. 801.5(c).

The term "intended use" refers only to the "intent of the persons legally responsible for the labeling of [the device]," generally, the manufacturer. 21 C.F.R. 801.4. And the FDCA's accompanying regulations recognize that "[t]he intended uses of an article may change after it has been introduced into interstate commerce by its manufacturer." 21 C.F.R. 801.4.

The FDCA enforces the labeling requirements by prohibiting the sale or distribution of a device that is "misbranded," which means that they are sold or "held for sale" without the approved intended use label. *see* 21 U.S.C. §§ 352 (defining misbranding of devices), 331(a), (b), (c) & (k) (collectively prohibiting misbranding in interstate commerce and while a device is "held for sale" after being sold in interstate commerce).

---

process, because such clearance does not require any finding that the devices and their instructions ensure safety—nor does such clearance establish that following those instructions are necessary to avoid patient harm. *See, e.g., Lewis v. Johnson & Johnson*, 991 F. Supp. 2d 748, 755-56 (S.D.W. Va. 2014) (citing *Medtronic, Inc.,* 518 U.S. at 493).

In addition to requiring certain labels, the FDCA also ensures that devices are manufactured, packed, and stored safely from the factory to final purchase. It does so by prohibiting the production, sale, and distribution of devices that are "adulterated." 21 U.S.C. § 331(a), (g), (k). A device is "adulterated" if it is not manufactured consistent with "current good manufacturing practice" requirements; or if it has been "prepared, packed, or held under insanitary conditions whereby it may have been contaminated with filth, or whereby it may have been rendered injurious to health." 21 U.S.C. § 351(a)(1).

So before a device can be sold, it must be manufactured safely and must contain a label explaining its "intended uses," and from factory to final purchase it must continue to have the required label and must not be packed or stored in a way that may render it injurious to health.[2]

To enforce these manufacturing, safe storage, and labeling requirements, the FDCA lists several "prohibited acts," including:

- The introduction or delivery for introduction into interstate commerce any device that is adulterated or misbranded;

- The adulteration or misbranding of any device in interstate commerce; and

---

[2] The FDCA imposes these same general requirements upon manufacturers and merchants of food, drugs, and cosmetics.

- The alteration, mutilation, destruction, obliteration, or removal of the whole or any part of the labeling of, or the doing of any other act with respect to, a device if such act is done <u>while such article is _held for sale_</u> (whether or not the first sale) after shipment in interstate commerce and results in such article being adulterated or misbranded.

21 U.S.C. § 331(a), (b), (f) & (k) (emphasis added).

Under Section 333(a), violation of Section 331 is a misdemeanor unless the person "commits such a violation with the intent to defraud or mislead," in which case the violation is a felony.

## B. Dr. Anita Jackson

Dr. Anita Jackson was a board-certified otolaryngologist and a Fellow in the American Academy of Otolaryngic Allergy. JA3009-3013. She graduated from Princeton University after majoring in molecular biology; she received a master's degree in biology from Stanford University and a medical degree from the University of Illinois College of Medicine, after which she received a master's degree in public health from Harvard University. JA3008-3010. She was the first Black woman to complete a surgical residency at the University of Tennessee-Memphis. JA3009. Dr. Jackson is also a single parent of two adopted sons, who are 11 and 8 years old. JA3008.

During the period at issue, Dr. Jackson had an otolaryngology practice called Greater Carolina Ear Nose and Throat with offices in four locations in central and eastern North Carolina where she treated patients with a variety of conditions, including allergies and sinusitis. JA3017-3019, JA3022.

### C. The Device at Issue

Dr. Jackson frequently treated her patients suffering from sinusitis by using balloon sinuplasty. "Sinusitis is the inflammation of the mucus membranes of the paranasal sinuses, which are paired air-filled cavities in the bones of the face lined by mucous membranes." *United States v. Facteau*, 89 F.4th 1, 16 n.5 (1st Cir. 2023) (cleaned up). "Balloon sinuplasty is offered as a less invasive surgical treatment for sinusitis than traditional endoscopic sinus surgery, which involves removal of tissue and bone." *Id*. The balloon sinuplasty procedure involves a device with a tiny balloon at the tip, which is inflated in the sinus to slightly enlarge a narrowed sinus opening back to normal size. JA3097, JA3228-3229.

To accomplish these treatments, Dr. Jackson used the Entellus XprESS Multi-Sinus Dilation Tool (the "device"), which allowed her to

examine a sinus and then treat it with the balloon if appropriate to do so. JA3231-3235.

"In 2010, Entellus Medical submitted a . . . 510(k) premarket notification, in which it sought [and then received] FDA clearance to market and sell the Entellus XprESS." JA55. The device's intended use label stated that its intended frequency of use is "single use." JA55-56. In her medical judgment, Dr. Jackson believed that the devices could be safely cleaned, sanitized, and re-used following a thorough process involving multiple sanitation products. JA3167-3170, JA3221-3223. And she did so.

As Dr. Jackson explained, she monitored the safety of the devices by taking cultures to ensure that the sanitation process was effective. JA3166. And, there was no evidence that any cross-contamination between patients occurred over the more than six years at issue here. JA3166-3167.

### D. The Charges

On January 4, 2022, the Grand Jury returned an indictment charging Dr. Jackson with twenty felonies by way of a 36-page speaking indictment. JA45-80.

The thrust of the Government's case against Dr. Jackson was that she committed the offense of "adulteration" by re-using a "single use" labeled device. *E.g.*, JA47 (charging adulteration because "in direct violation of [the intended use label], Jackson re-used the Entellus XprESS devices on . . . patients"). The indictment alleged that this conduct specifically violated §§ 331(k) and 333(a)(2), which collectively criminalize "adulteration" of a device "with the intent to defraud or mislead" while the device is "held for sale." JA59-62.

The indictment also charged her with a host of other healthcare offenses that were allegedly designed to further or cover up the adulteration scheme. JA63-78. These offenses included charges in Counts 12-14 for making false statements to auditors by supplying patient medical records that were modified after-the-fact. JA66-71. Count 14 specifically charged her with supplying false and/or modified records in response to a 2018 audit. JA66-71. Counts 15 and 16 charged that, as part of the conduct alleged in Count 14, Dr. Jackson submitted forged patient declarations and thus committed Aggravated Identity Theft in violation of 18 U.S.C. § 1028A. JA71-72. Other charges included three acts of mail fraud and numerous Anti-Kickback Statute violations

for reducing coinsurance for certain patients. JA63-66, JA72-75. Finally, the indictment alleged that all of the conduct constituted one overarching conspiracy. JA75-78.

The Government explained that "the allegations with respect to adulteration are interwoven quite intentionally with the [other counts] because it was [alleged to be] one big scheme. That's been our allegation throughout, and we stand by that." JA3761.

### E. Relevant Pretrial Proceedings

Dr. Jackson moved to dismiss all charges for facial insufficiency, JA137-149, and the trial court denied this motion by oral order, JA626-627.

### F. The Trial Theory and Rulings

At the outset of jury selection, the trial court explained that the FDCA charge alleged "re-use of single use balloon sinuplasty devices." JA4094-4095. Then, throughout trial, the Government made clear that its theory of prosecution was that Dr. Jackson committed the offense of adulteration by reusing a device that the manufacturer's intended use label identified as a "single use" device. *See, e.g.*, JA731-733, JA735, JA826, JA830, JA1382, JA2220, JA2230, JA2257-2258, JA2397-2398, JA3411, JA3419. The Government forecast at the beginning of its

opening that it "w[ould] not be attempting to show . . . that any specific device was contaminated or that any one patient got sick." JA735. Instead, the Government asserted that "th[e] device was never intended to be reused," that the "instructions . . . were cleared by the FDA" and "[t]hey told this defendant . . . do not re-use this device. . . . But . . . that's exactly what the defendant did." JA731-733. The Government consistently argued—and the trial court erroneously instructed—that reusing a device constituted a *per se* violation of the FDCA, specifically the adulteration offense at § 331(k). JA3414-3415, JA3421, JA3451 (argument); JA3514-3516 (instructions).

Notably, the Government did not call a single expert witness to opine that the devices could not be safely reused. Instead, the Government relied on lay witnesses to explain that the FDA only approved the device to be sold with the single use label. *See, e.g.*, JA805; JA1349; JA2257-2258.

Ultimately, when summing up the evidence, the trial court explained, "the evidence at trial showed [that Dr. Jackson] . . . reused single-use devices." JA3934. It did not state that the evidence proved

the devices were in fact unsafe, JA3934, and it recognized that there was no evidence that any patient was harmed. JA3935.

Dr. Jackson testified in her defense, as did staff members and patients. She and her staff explained the thorough cleaning process to which the devices were subjected. *See, e.g.*, JA3167-3169. But the trial court prohibited her from showing a video that demonstrated her cleaning process. JA3079-3080. The trial court also instructed the jury that it is "irrelevant" that no patient was ever harmed, *see* JA3161, JA3167, JA3515, and it prevented her from introducing CDC guidelines that show that 20-30 percent of hospitals re-use single use devices and that the cleaning process she used was consistent with CDC guidelines, JA3638.

With the jury in the courtroom, the trial court also endorsed the Government's theory that—notwithstanding Section 396—a doctor's re-use of a device labeled as a single use device in and of itself constitutes the offense of adulteration under Section 331(k). *See* JA2946-2947.

Importantly, the uncontroverted evidence established that Dr. Jackson was acting *within* a legitimate doctor-patient relationship when she was using (and reusing) the devices. Rather than contest this fact,

the Government argued—and, notwithstanding Section 396, the trial court agreed—that the re-use of a device labeled as "single use" in and of itself constitutes the offense of adulteration under Section 331(k). *See, e.g.*, JA3414-3417.

At the close of all evidence, Dr. Jackson renewed each of her objections and motions and moved for a judgment of acquittal on all counts, which was denied. JA3371.

## G. The Trial Court's Denial of Dr. Jackson's Requested Jury Instructions

Dr. Jackson requested that the jury be instructed on several points of law clarifying that Dr. Jackson had discretion to use devices in the treatment of patients as she saw fit and that the re-use of a medical device labeled as "single use" is not standing alone unlawful. JA238-241. In rejecting these requests, the trial court refused to inform the jury of the existence of Section 396 in any way. Instead, it instructed that the charged offense of adulteration with intent to defraud is proven if Dr. Jackson did "not disclose to a patient that she was reusing a single-use . . . device that she had used on a different patient and that one of her reasons for doing so was to enrich herself." JA3516.

### H. The Prosecutor's Golden Rule Argument

In closing argument, the prosecutor focused the jury on the question of which device *the jurors* would want if they were Dr. Jackson's patients, *i.e.*, the alleged victims:

> Which [device] would you want? . . . If you could have a device that had been here fully coated and contaminated with another person's blood and mucous, or you could have that perfectly pristine device, which one would you want? Which one would you choose?

> Let me add another factor to your choice. What if I told you that this device was tested to ensure it was completely sterile -- this one -- tested to make sure it's completely sterile; that this one, because it had never been used, had zero risk, zero risk that another human's bodily fluids would get inside your body. Zero risk of that happening. Would that impact your decision?

JA3418.

The Government also answered that question: "This [brand new device] is what you would want. This is what I would want." JA3417. Thus, it asked the jury to decide the issue of adulteration not based on applying the law to the facts, but based on their personal feelings after placing themselves in the shoes of the alleged victims.

### I. Verdict and 25-Year Sentence

The jury returned a verdict of guilty as to all counts. JA3576-3578; JA3650-3657.

At sentencing, the trial court recognized that there was no evidence of any patient harm, JA3935, and it summed up the trial evidence as establishing that Dr. Jackson "reused single-use devices," JA3973. The court then expressed its belief that reusing devices labeled for single use is "shameful" and shows that she was "consumed by greed." JA3941-3942. It also expressed its determination, based on weighing the credibility of the witnesses, that Dr. Jackson committed perjury during her testimony. JA3772-3773.

Even though Dr. Jackson did not harm a single patient, and notwithstanding the fact that she is the sole parent of two children, the trial court sentenced Dr. Jackson to 300 months (25 years) in prison. JA3967-3969, JA4060-4065. It also issued an "alternative variant sentence," stating that, even if it erred in calculating the guidelines, it would impose the same sentence. JA3948.

Dr. Jackson timely filed notice of appeal to this Court. *See* JA3975-3976, JA4066-4067.

## SUMMARY OF ARGUMENT

The FDCA conviction must be vacated for at least five reasons.

First, the charge fails to state an offense. Section 331(k) of the FDCA criminalizes acts that result in a medical device being potentially injurious to health, but only if such acts are done while the device is "held for sale." Section 396 of the FDCA also establishes that doctors acting within a legitimate doctor-patient relationship may "use approved in any manner they wish." *Caplinger*, 784 F.3d at 1344. Yet,

    a. The FDCA charge did not allege that the devices were held in anticipation of a future purchase, but instead erroneously interpreted "held for sale" to mean "held for use" or "use";

    b. It alleged that Dr. Jackson's culpable act was the "re-use" of a medical device but did not allege that such use occurred outside a legitimate doctor-patient relationship; and

    c. It did not allege that "re-use" *in fact* caused the devices to be injurious to health, but instead relied on an invalid and unconstitutional theory that such re-use was a *per se* violation of the FDCA.

Second, the Government did not present sufficient evidence to support the FDCA conviction because it did not present any evidence that the devices were "held for sale" under that term's plain meaning; because there was no evidence that the alleged acts occurred outside a legitimate doctor-patient relationship; and because there was no evidence that any patients were harmed or that any specific devices were contaminated or harmful, and there was no expert testimony that the devices could not be effectively cleaned or that Dr. Jackson's cleaning process was insufficient.

Third, whereas the Fifth and Sixth Amendment require that a defendant be allowed to present a complete defense, the trial court erroneously and prejudicially limited Dr. Jackson's testimony by refusing to allow her to demonstrate her cleaning process; by prohibiting her from informing the jury of the CDC guidelines that her cleaning process followed; and by excluding a CDC document she relied upon to form her belief that her conduct was allowable (and thus not fraudulent), which showed that 20-30 percent of hospitals re-use devices labeled as "single use" devices.

Fourth, the jury instructions were erroneous and prejudicial. Section 396 establishes that doctors may use approved devices "in any manner they wish." *Caplinger*, 784 F.3d at 1344. The trial court erroneously instructed the jury by failing to instruct on the substance of Section 396 and by refusing to instruct that that a doctor's use of a device in a manner different from its label is not a *per se* violation of the FDCA. The FDCA charge also required the Government to prove that Dr. Jackson acted with criminal intent, but the trial court erroneously instructed the jury that Dr. Jackson's good faith in the re-use of the device was irrelevant.

Fifth, the Government made an impermissible "Golden Rule" argument when it argued that the jury should decide the case based on whether if they were Dr. Jackson's patients (*i.e.*, the alleged victims) they would want to be operated on with a new device or a used device.

These errors with respect to the FDCA charge require reversal of all counts. The Government explained that the case was "one big scheme" in which all charges were "interwoven." It presented improper evidence that Dr. Jackson was a corrupt and dangerous doctor because she reused devices labeled as single use. That highly prejudicial evidence would not

have been admissible in a case without the erroneous FDCA count, and, but for the other FDCA errors, the jury would have heard evidence corroborating Dr. Jackson's good faith and would not have been left with the erroneous impression that re-use is *per se* criminal and presumptively harmful. Because intent was a central issue on each of the other charges, and because the FDCA evidence would be inadmissible in a trial without the FDCA charge, the FDCA errors reversibly prejudiced Dr. Jackson as to each charge.

The Aggravated Identity Theft convictions must be vacated for the independent reason that the indictment failed to allege—and the jury instructions failed to require the jury to find—that the alleged identity theft was "the crux of what ma[de] the [underlying conduct] criminal." *Dubin v. United States*, 599 U.S. 110, 114 (2023).

Finally, remand to a new judge is warranted. The trial court repeatedly and forcefully expressed its legal and factual opinions throughout the trial and sentencing and then sentenced Dr. Jackson to 25 years in prison. Because it would be reasonable for an observer or for Dr. Jackson to question whether those opinions may influence the trial court on remand, this Court should remand the case to a new judge.

# ARGUMENT

## I. THE FDCA CHARGE MUST BE VACATED.

Contrary to the allegations in the indictment, a doctor's re-use of a device labeled by the manufacturer as being intended for "single use" is not a *per se* violation of the FDCA. Indeed, the FDCA cannot apply to a doctor's administration of a device to a patient, and doctors are not required to follow devices' intended use labels, even labels designating an item as "single use only." That is because, with 21 U.S.C. § 396, Congress "went out of [its] way to protect the liberty of doctors and patients to use approved devices in any manner they wish." *Caplinger*, 784 F.3d at 1344; *Judge Rotenberg Educ. Ctr.*, 3 F.4th at 395. Moreover, the FDCA charge only applies to items that are "held for sale," which the indictment made clear the devices at issue were not. Accordingly, the FDCA charge failed to state an offense, and the proof was insufficient to support a conviction.

Additionally, the FDCA conviction should be vacated because the trial court abused its discretion in prohibiting Dr. Jackson from demonstrating how she cleaned and sanitized the devices and from testifying and introducing documents to support that she believed her

sanitization and re-use process was effective and legally sound; the trial court erred in its jury instructions; and the Government violated the "Golden Rule" during its closing argument.

### A. The FDCA charge fails to state an offense.

"A criminal indictment—like a civil complaint—should be dismissed for failing 'to state an offense.'" *United States v. Brewbaker*, 87 F.4th 563, 572 (4th Cir. 2023) (quoting Fed. R. Crim. P. 12(b)(3)(B)(v)). "An indictment may legally fail to state an offense by omitting a necessary element. But it may also fail to state an offense if 'the allegations therein, even if true, would not state an offense.'" *Id.* (cleaned up). "[W]hether the allegations fail to state an offense is a legal question [the Court] review[s] *de novo*." *Id.*

The FDCA offense at issue has four elements: (1) an act resulting in a device being "adulterated," (2) performed while such device is "held for sale" in interstate commerce, (3) performed with the intent to defraud or mislead, and (4) which administration of the legally marketed device was outside a legitimate health care practitioner-patient relationship. §§ 331(k), 333(a)(2) & 396.

As to the first element, an act causes "adulteration" if it causes the device to have "been prepared, packed, or held under insanitary conditions whereby it may have been contaminated with filth, or whereby it may have been rendered injurious to health." § 351(a)(2)(A). Importantly, because doctors may "use approved devices in any manner they wish," *Caplinger*, 784 F.3d at 1344, and because intended use labels do not have the force of law, *see, e.g., id.*, adulteration is not proven merely by showing that a doctor used a device in a manner different from its "intended use" as set forth on the FDA-approved label. Instead, adulteration requires the Government to prove that the device was *in fact* held under insanitary conditions that rendered it reasonably likely to be injurious to patients' health. *See* § 351(a)(2)(A).

The second element—that the adulterating act must occur while the device is "held for sale"—ensures that products are covered from manufacturer to final purchase (and ensures the criminalized act affects interstate commerce), while also reinforcing the FDCA's balance of regulating the manufacture and sale of covered products without infringing on the discretion of medical professionals and other purchasers to use medical devices "in any manner they wish," *Caplinger*, 784 F.3d at

1344. The Supreme Court has noted that the term "held for sale" is unambiguous. *See United States v. Sullivan*, 332 U.S. 689, 695–96 (1948). Accordingly, its plain meaning controls—as it must, for "people are entitled to rely on the law as written, without fearing that courts might disregard its plain terms based on some extratextual consideration." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 674 (2020). "Held for sale" plainly means held in anticipation of a future purchase/sale. *See, e.g.*, *Sullivan*, 332 U.S. at 698 ("held for future *sales* in . . . commerce" (emphasis added)). It does not mean held waiting to be used.

The third element—that the violation occurred "with the intent to defraud or mislead"—makes the crime a felony. § 333(a)(2).

The fourth element is found in Section 396, which provides:

> Nothing in this chapter shall be construed to limit or interfere with the authority of a health care practitioner to prescribe or administer any legally marketed device to a patient for any condition or disease within a legitimate health care practitioner-patient relationship.

§ 396.

Here, the indictment alleged that Dr. Jackson violated § 331(k) because she "reused [the] devices on her patients, even though the devices were marketed and sold to [her] . . . as 'single use' devices," and

"were not approved or cleared by the FDA to be reprocessed or reused." JA47. It then alleged that the conduct was felonious because, "[d]espite owing a medical duty to her patients, [Dr.] Jackson concealed from them the fact that she was reusing the . . . devices in violation of the FDA cleared manufacturer instructions." JA60. Thus, the charged "act" was the "re-use" of the devices "on her patients." JA47, JA60.

This charge is defective (1) because it does not allege facts supporting that the items were "held for sale," but instead incorrectly equates *sale* with *use*; (2) because it does not include an allegation that Dr. Jackson was acting outside of a legitimate doctor-patient relationship; and (3) because it is based on a defective theory that re-use of a device labeled as "single use" is *per se* adulteration.

### 1. The FDCA charge is defective for failing to allege that the devices were "held for sale."

Rather than alleging that Dr. Jackson held the devices in advance of someone purchasing them, the Government alleged only that Dr. Jackson "used" (and "reused") the devices during medical procedures. *See*, *e.g.*, JA47, JA60. Neither using a device nor holding it for use constitutes holding it for "sale." Thus, the FDCA charge fails to state an offense.

### a. Holding a device for sale does not include holding it for use or using it.

This Court has never addressed the meaning of the phrase "held for sale" in Section 331(k), and the statute does not expressly define the term. But the Supreme Court has explained that the term is unambiguous. *Sullivan*, 332 U.S. at 695-96 ("It would require great ingenuity to discover ambiguity in the additional requirement of Section 331(k) that the misbranding [or adulteration] occur 'while such article is held for sale after shipment in interstate commerce.'" (cleaned up). Therefore, the Court must "construe [the] term in accordance with its ordinary or natural meaning." *FDIC v. Meyer*, 510 U.S. 471, 476 (1994).

### i. The plain meaning of "held for sale" controls and does not include using a device or holding it for use.

"Held for sale" means holding a good in advance of "the transfer of ownership of and title to [the device] from one person to another for a price." Merriam-Webster.com (2023) (defining "sale"); UCC § 2-106(1) ("A 'sale' consists in the passing of title from the seller to the buyer for a price."); New Oxford American Dictionary 1541 (3d ed. 2010) (defining "for sale" as "offered for purchase"); *cf.* 21 C.F.R. 801.422 (regulation promulgated pursuant to the FDCA) (defining "sale" as "purchase or

exchange for value").  Indeed, the Supreme Court applied this definition to the term, noting that the term means that the good is "held for future *sales* in . . . commerce."  *Sullivan*, 332 U.S. at 698 (emphasis added).  Accordingly, "there is nothing left for the Court to consider."  *United States v. Jones*, 60 F.4th 230, 234 (4th Cir. 2023).  "Held for sale" under Section 331(k) unambiguously means held in advance of a future transfer of title (*i.e.*, a purchase/sale).  The use of a device does not "transfer ownership or title"; thus, "held for sale" does not mean held for future "use."

Numerous canons of construction further support applying the plain meaning.  Courts "interpret statutes as a symmetrical and coherent regulatory scheme."  *FDA v. Brown*, 529 U.S. at 133 (cleaned up).  The FDCA regulatory scheme expressly prohibits applying it to a doctor's administration of a device to a patient.  § 396.  Yet, if "held for sale" meant "use," then Section 331(k) would override Section 396.  Similarly, the "held for sale" term was included in Section 331(k) to provide the requisite nexus between the prohibited acts and interstate commerce, *cf.* § 331(a)-(c), but if "held for sale" means "use" or "held for use," the term would not ensure the requisite interstate commerce nexus.  For example,

Section 331(k) prohibits removing labels from devices. But if "held for sale" meant "held for use," then it would prohibit purchaser from removing a label from a covered device, an act that has no nexus to interstate commerce.

Similarly, "when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended," *In re Brown*, 932 F.3d 162, 170 (4th Cir. 2019) (cleaned up). The FDCA employs the terms "use" and "sale" distinctly. For example, Section 396 distinguishes between "the sale" and the "administration" (*i.e.*, use) of a device. *See* § 396. So too does the definition of "misbranding," which provides different labeling requirements for devices "intended for *use* in health care facilities." § 352(f) (emphasis added). Section 333(b)(1)(B) criminalizes to "knowingly selling, purchasing, or trading a drug or drug sample or knowingly offering to sell, purchase, or trade a drug or drug sample," but recognizes that drug samples exist to be administered to patients by doctors (*i.e.*, "used" in the practice of medicine). *See* § 353(d). Because the FDCA employs different words, the Court must presume those words—sale and use—have different meanings.

The "major questions doctrine" also supports applying the plain meaning. This doctrine requires "clear congressional authorization" before concluding that Congress meant to give an agency "an extraordinary grant of regulatory authority." *N. Carolina Coastal Fisheries Reform Grp. v. Capt. Gaston LLC ("N.C. Fisheries")*, 76 F.4th 291, 297 (4th Cir. 2023) (cleaned up). This doctrine stems in part from *FDA v. Brown, see id.*, where contrary to its historical representations to Congress, the FDA suddenly claimed to interpret the FDCA as providing the FDA jurisdiction to regulate the tobacco industry, which "constitute[es] a significant portion of the American economy," *FDA v. Brown*, 529 U.S. at 159. The Court rejected this new interpretation, holding that Congress would not have given the FDA this expansive regulatory authority in "so cryptic a fashion." *Id.*

Similarly here, the FDA has long claimed—and continues to claim—that it does not have authority to regulate doctors' practices. *See, e.g., Chaney v. Heckler*, 718 F.2d 1174, 1179 (D.C. Cir. 1983) (noting FDA's position in context of Section 331(k) that "physicians' use of drugs [to treat patients] is not within FDA's jurisdiction" since the "FDCA does not regulate physicians in their practice because physicians are licensed

by the states"), *rev'd*, 470 U.S. 821 (1985); *see also* FDA's Role in Regulating Medical Devices (2024)[3] ("The FDA does not have the authority to: Regulate a physician's or nurse's practice.  FDA does not tell providers what to do when running their business or what they can or cannot tell their patients.").

Yet, the Government is now suddenly asserting that the FDA has that power—that is, the power to regulate how every medical provider in the country uses and stores medical devices—on the basis of the statutory term "held for sale."  Just as the Court refused to allow the FDA to regulate an entire industry in the absence of clear statutory authority in *FDA v. Brown*, 529 U.S. at 160, and just as it prohibited the EPA from exercising "newfound authority to regulate millions of small sources" absent express statutory authority in *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014), this Court should refuse to grant the FDA newfound authority to regulate millions of healthcare providers' use and storage of medical devices on the basis of the term "held for sale."  *See N.C. Fisheries*, 76 F.4th at 297.

---

[3]      Available      at:      https://www.fda.gov/medical-devices/home-use-devices/fdas-role-regulating-medical-devices (last accessed March 13, 2024).

Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not . . . hide elephants in mouseholes." *Santoro v. Accenture Fed. Servs., LLC*, 748 F.3d 217, 223 (4th Cir. 2014) (cleaned up). "Even those [arguing for an application of Section 331(k) beyond] the plain meaning of ['held for sale'] would be hard pressed to explain why, to express the concept of any transmission to the ultimate ingester [or patient] (as opposed to the ultimate purchaser) of the drug [or device], Congress should choose the peculiarly inapt phrase 'held for sale.'" *Heckler*, 718 F.2d at 1199 (Scalia, J., dissenting), *majority op. rev'd*, 470 U.S. 821.

Thus, if Congress intended the FDCA to regulate devices in the hands of users—as opposed to manufacturers and sellers, which are the focus of the regulatory scheme—or to regulate all healthcare providers' use of devices (notwithstanding Section 396), it would have said so clearly and not relied on the term "held for sale" to drastically expand the coverage of the Act. Accordingly, the major questions doctrine supports limiting the coverage of Section 331(k) to items plainly held for sale—and to exclude from such coverage items held for use or being used.

Finally, to the extent that any ambiguity remains, the rule of lenity also prohibits including "held for use" or "use" within the term "held for sale."

### ii. The Ninth Circuit's decision in *United States v. Kaplan* is unpersuasive.

In declining to dismiss the adulteration count, the trial court relied on *United States v. Kaplan*, 836 F.3d 1199 (9th Cir. 2016), where the Ninth Circuit applied Section 331(k) to a doctor's re-use of a device labeled for single use. JA626. In *Kaplan*, a doctor reused during biopsies a "needle guide," a thin hollow tube that houses a biopsy collection needle, that were labeled as being intended for "single use." *Kaplan*, 836 F.3d at 1204. The doctor argued that "held for sale" cannot be read to mean "held for use," but the Ninth Circuit disagreed. It viewed "[t]he single-use nature of the guides [to be] particularly critical to [its] decision." *Id.* at 1209-10. And it determined that "[a] single-use device is meant to be 'consumed' in the course of treating a patient—just like a drug," concluding that, "[o]nce the single-use device is used or consumed there is nothing left to be done with the device. It no longer possesses a functional purpose in the medical practice and, rather than giving the used device to the patient, the doctor disposes of it." *Id.* Based on these

assumptions, the Ninth Circuit held, "when a physician uses a disposable device on a patient, the device is 'held for sale' within the meaning of the FDCA provided that there is a commercial relationship between the doctor and the patient and that the device is one that is meant to be 'consumed' in the process." *Id.*

The fundamental problem with this reasoning is that it assumes that the single use label carries the force of law about how a device can be used and thus categorically prohibits its re-use. But the FDCA and its accompanying regulations—and the fact that 20-30 percent of hospitals re-use single use devices, JA3638—show that this assumption is incorrect. Like any label, a single use label is merely the manufacturer's or seller's "intended use" for the product. *See* 21 C.F.R. 801.4. That means only that the manufacturer or merchant did not ask the FDA to approve the device being reused. Importantly, it does not mean that the device cannot safely be cleaned and reused. *Cf.* 21 C.F.R. 801.4 ("The intended uses of an article may change after it has been introduced into interstate commerce by its manufacturer.").

Indeed, the single use label is hearsay; it should not be introduced for the truth that the device can only be used once because the label

merely shows that the manufacturer did not seek or obtain FDA approval for a cleaning and re-use procedure. *Cf. Lewis*, 991 F. Supp. 2d at 755-56 (to avoid "the very substantial dangers of misleading the jury," excluding as irrelevant the fact that a device was cleared by the FDCA 510(k) process because "[t]he Supreme Court has determined that the 510(k) process is focused on equivalence, not safety.") (cleaned up).

The Ninth Circuit then addressed whether Section 396 prohibits applying Section 331(k) to the doctor's use of the device in question. It stated that this argument was "foreclosed by" *United States v. Regenerative Sciences, LLC*, 741 F.3d 1314 (D.C. Cir. 2014). *See Kaplan*, 836 F.3d at 1210. That determination is also wrong. *Regenerative Sciences* dealt not with the use of devices but the production of drugs. *Regenerative Sciences*, 741 F.3d at 1319. And Section 396 does not apply to drugs; it only applies to devices. § 396 (excluding from FDCA regulation the administration of legally marketed *devices*). Moreover, *Regenerative Sciences* involved a civil injunction obtained by the FDA against a company that *produced* a certain drug mixture and licensed it to a medical practice. 741 F.3d at 1319. The FDA ruled that the mixture constituted a "drug"; the defendants were therefore drug manufacturers

and required to follow the FDCA's drug manufacturing and labeling provisions. *Id*. The district court agreed, and on appeal, the court found no abuse of discretion or clear error. Indeed, "appellants d[id] not actually dispute that the plain language of the statutes compels th[e] conclusion" that the company was producing "drugs." *Id*. at 1319. Since *Regenerative Services* was about manufacturing drugs, not a doctor's use of a device, it cannot foreclose that Section 396 prohibits applying the Section 331(k) to a doctor's use of a device.

The *Kaplan* court was also wrong to hold that the doctor's re-use of devices was not protected "off-label" use because "off-label use does not immunize a physician who uses adulterated products." 836 F.3d at 1211. This type of circular reasoning begs the question. If reusing a single use device constitutes adulteration, which is illegal, then, of course, re-use is not allowed. But such reasoning assumes the conclusion—that is, that re-use is not allowed—and does not actually address whether re-use of a device labeled as single use is a protected use under Section 396.

The other cases cited in *Kaplan* do not change the analysis or the result. In *United States v. Rhody Dairy, LLC*, 812 F. Supp. 2d 1239, 1243-44 (W.D. Wash. 2011), the court dealt with an FDA request for an

injunction requiring a farm to comply with the FDCA. The defendants were "in the business of selling cow's milk and cows for beef," and the FDA contended that they adulterated such food by injecting their cows with certain drugs. *Id*. at 1242. The district court granted the injunction prohibiting the defendant from "selling . . . or distributing any animals whose edible tissue contains new animal drugs in amounts above the levels permitted by law." *Id*. at 1246. Its discussion of the "held for sale" provision merely noted that courts have occasionally applied the term to include doctors using drugs and devices. *Id*. at 1244. In doing so, it cited the same cases upon which the Ninth Circuit in *Kaplan* relied, *see id.*, but those cases—each of which is discussed below—do not support the *Kaplan* holding that devices are "held for sale" if used by doctors to perform procedures on patients.

*United States v. Evers*, 643 F.2d 1043, 1052-54 (5th Cir. 1981), concluded that a doctor did *not* violate the "adequate directions for use" section of the FDCA in his distribution of cancer drugs to patients because there were no adequate directions of use for the drug that the doctor needed to provide to the patient. *Id*. Indeed, the court noted "[t]he requirement which the FDA seeks to impose is nonsensical." *Id*. at 1053.

In *dicta*, the court wrote that drugs—at least those that a doctor advertised he would provide to patients—could be held "for sale" by a doctor. *Id.* at 1050. In any event, unlike drugs, patients do not ingest devices, and Section 396 expressly prohibits applying the FDCA to doctor's administration of "devices" as opposed to drugs.

In *United States v. Device Labeled "Cameron Spitler Amblyo-Syntonizer,"* 261 F. Supp. 243, 246 (D. Neb. 1966), the court concluded in an *in rem* proceeding against the "Cameron Spitler" device that the device was required to be labeled "when introduced into and while in interstate commerce." *Id.* at 245. The issue in the case was whether the devices were exempt from labeling—an issue not relevant to the instant case. *Id.* at 245-46. Then, in *dicta*, the court "opin[ed] that the devices were misbranded while being held for sale" because, "[a]lthough the [doctor] never sold the devices in the commercial sense, the device was used in the claimant's treatment of patients." *Id.* at 246. That court relied on another district court case finding that *drugs* were "held for sale" until ingested by a patient, *id.* (citing *United States v. 10 Cartons of Black Tablets*, 152 F. Supp. 360 (W.D. Pa. 1957)), which because it involved drugs does not apply to devices. Moreover, Justice Scalia would

later explain that the holding of *10 Cartons* was "erroneous, as later case law has established." *Heckler*, 718 F.2d at 1199 (Scalia, J., dissenting) (cleaned up), *majority op. rev'd*, 470 U.S. 821.

And in *United States v. Diapulse Corp. of America*, 514 F.2d 1097, 1098 (2d Cir. 1975), the per curiam court relied on the *"Cameron Spitler"* and *10 Cartons* cases—without citing any other cases or providing any further analysis—to uphold a modification to an injunction prohibiting the interstate shipment of a misbranded device to apply it as well to practitioners.

Thus, *Kaplan*'s reliance on case law is misplaced.

Finally, *Kaplan* failed to address the statutory provisions and regulations that distinguish between "sale" and "use," *see* §§ 396, 352(f); or those that define "sale" using its ordinary meaning, *see* 21 C.F.R. 801.422 (defining sale as a "purchase or exchange for value"); or those that show that devices' intended use labels, including single use labels, are not binding on doctors, *cf.* § 396; 21 C.F.R. 801.4 (noting that intended uses may change). Nor did it explain why Congress would have "[chosen] the peculiarly inapt phrase 'held for sale'" to describe "use" or "held for use." *Heckler*, 718 F.2d at 1199 (Scalia, J., dissenting), *majority op. rev'd*,

470 U.S. 821. And it failed entirely to address the statements in *Caplinger* and *Judge Rotenberg Education Center* that doctors may "use approved devices in any manner they wish." *Caplinger*, 784 F.3d at 1344; *Judge Rotenberg Educ. Ctr. v. FDA*, 3 F.4th at 395.

Accordingly, *Kaplan* is not persuasive, and the district court erred by following it here.

### iii. Equating "held for sale" with "use" or "held for use" would render Section 331(k) unconstitutionally vague.

Applying the *Kaplan* holding would render the offense unconstitutionally vague because the plain language of the statute and the overall statutory and regulatory regime inform a person of ordinary intelligence that a doctor's use of a device within the doctor-patient relationship cannot violate Section 331(k).

An offense is unconstitutionally vague as applied if the defendant "could not reasonably understand that [their] contemplated conduct is proscribed." *United States v. Hasson*, 26 F.4th 610, 618 (4th Cir.), *cert. denied*, 143 S. Ct. 310 (2022) (cleaned up). A strict liability offense—such as Section 331(k)—is particularly susceptible to a vagueness challenge. *See, e.g.*, *Carolina Youth Action Project v. Wilson*, 60 F.4th 770, 786 (4th

Cir. 2023); *cf. Colautti v. Franklin*, 439 U.S. 379, 394 (1979) ("The vagueness of the [offense] is compounded by the fact that the Act subjects the physician to potential criminal liability without regard to fault."), *abrogated on other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, (2022).

*Kaplan* imposed strict criminal liability upon doctors who are reasonably led to believe that they are statutorily protected from liability for conduct occurring while devices are held for use or being used. *Cf.* §§ 331(k), 396; *Heckler*, 718 F.2d at 1199 (Scalia, J., dissenting) ("Under no conceivable interpretation of the English language could [items held for use] be deemed 'held for sale.'"). Due process prohibits reaching such a result.[4]

\* \* \*

The term "held for sale" unambiguously means held in advance of a future purchase/sale, and thus does not mean "held for use" or "use." *Kaplan* is contrary to the plain language of the statute and the content and purpose of the overall regulatory regime, and applying that holding here violates due process. The trial court erred in relying on *Kaplan* to

---

[4] If "held for sale" includes "use" or "holding for use," Dr. Jackson submits that the FDCA offense is also unconstitutionally vague as applied.

deny Dr. Jackson's motion to dismiss. Because the indictment alleged that the devices were held for a doctor's use—not in advance of being purchased/sold—the FDCA count failed to allege the "held for sale" element and must be dismissed.

> **2. The FDCA charge is defective for failing to allege that Dr. Jackson was acting outside of a legitimate doctor-patient relationship.**

Section 396 prohibits applying any provision of the FDCA to doctors "administer[ing] a[] legally marketed device to a patient within a legitimate health care practitioner-patient relationship." § 396. Yet, the Government attempted in Count One to use the FDCA to criminalize Dr. Jackson's use of a medical device *within* a legitimate doctor-patient relationship. JA45-80.

The Government alleged that, "by no later than January of 2014, in direct violation of express warnings and precautions, Jackson *reused* the . . . devices on . . . *patients*; that "[Dr.] Jackson directly profited from *the practice of reusing the . . . devices* . . . , rather than purchasing and delivering new . . . devices to each patient"; and that "[Dr.] Jackson defrauded and misled her clients *with respect to the re-use of the . . . devices.*" JA60 (emphasis added).

Thus, Dr. Jackson was charged with "reusing" the devices. That re-use constitutes the "administration" of medical devices under Section 396. Accordingly, under Section 396, it can be regulated by the FDCA only if it was conducted outside of a "legitimate health care practitioner-patient relationship." *Id.* The failure of the indictment to allege that the conduct was outside of a legitimate doctor-patient relationship thus renders the indictment defective for failure to state an offense.

### 3. The Government's theory of *per se* adulteration is defective.

FDA-mandated labels do not have the force of law as to doctors' use of devices; rather, with Section 396, "legislators went out of their way to protect the liberty of doctors and patients to use approved devices in any manner they wish—including [contrary to the] label." *Caplinger*, 784 F.3d at 1344. Indeed, Section 396 shows not only that Congress "kn[ew] about" uses contrary to labels; it "even encourag[ed]" such uses by doctors and patients. *Id.* Rather than carrying the force of law, "[t]he words *intended uses* . . . refer to the objective intent of the persons legally responsible for the labeling of [the device]." 21 C.F.R. 801.4. And FDA regulations expressly recognize that devices will be used in a manner different from those set forth on their intended use labels. 21 C.F.R.

801.4 ("The intended uses of an article may change after it has been introduced into interstate commerce by its manufacturer.").

Simply put, the labeling regulations merely control the uses for which devices can be marketed and sold, but do not limit the manner in which doctors can use devices in the treatment of their patients. *See, e.g.*, *Facteau*, 89 F.4th at 15 ("The statutory and regulatory scheme governing medical devices limits the *commercial distribution* of devices to ensure that devices on the market are reasonably safe and effective" for the purposes for which the manufacturers intend them to be used, but the scheme "preserv[es] health care professionals' discretion to . . . administer devices as they deem appropriate." (emphasis added)); *Buckman Co.,*, 531 U.S. at 350 (citing Beck & Azari, *FDA, Off–Label Use, and Informed Consent: Debunking Myths and Misconceptions*, 53 Food & Drug L.J. 71, 76–77 (1998)) ("FDA never has had authority to regulate the practice of medicine; physicians may use legally marketed drugs or devices in any way that they believe, in their professional judgment, will best serve their patients."); *Caplinger*, 784 F.3d at 1344; *Judge Rotenberg Educ. Ctr.*, 3 F.4th at 395. Indeed, 20-30 percent of hospitals re-use devices labeled as "single use" devices. JA3638.

Therefore, it cannot be a *per se* violation of the FDCA for a doctor to use a device in a manner different from the way its manufacturer intended as provided on the label—including reusing a device labeled as a "single use" device. Yet, the indictment's FDCA charge rested on this defective *per se* theory.[5] *E.g.,* JA47.

*     *     *

For each of these reasons, the indictment failed to state an offense under the FDCA.

## B. The evidence was insufficient to support the FDCA conviction.

Not surprisingly, since the charge failed to state an offense, the Government did not present sufficient evidence to support the FDCA charge.

The Court "reviews the sufficiency of the evidence to support a conviction by determining whether there is substantial evidence in the record, when viewed in the light most favorable to the government, to

---

[5] Indeed, such a theory would constitute an unconstitutional conclusive presumption. *See Francis v. Franklin*, 471 U.S. 307, 317 (1985) (Conclusive presumptions unconstitutionally "remov[e] the presumed element [here, adulteration] from the case entirely if the [Government] proves [separate] predicate facts,"); *see also Sandstrom v. Montana*, 442 U.S. 510 (1979) (same).

support the conviction." *United States v. Green*, 599 F.3d 360, 367 (4th Cir. 2010) (cleaned up). "'Substantial evidence' is 'evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt.'" *Id.* (cleaned up).

Here, the Government did not prove that the items were "held for sale," since the devices were not; they were held for use. The Government also did not prove, or attempt to prove, that Dr. Jackson was acting outside of a legitimate doctor-patient relationship. And, rather than attempt to prove that Dr. Jackson's sanitation process was ineffectual— that is, that the devices were in fact adulterated, or that Dr. Jackson's patients got sick from or were otherwise injured by her re-use of the devices—the Government relied on a defective theory of *per se* adulteration for reusing devices labeled as "single use" devices.

Critically, the Government did not call an expert to testify that the device could not be cleaned, and it did not prove, or even attempt to prove, that the devices harmed anyone. JA 735, JA3904. Instead, it relied entirely on the intended use label, which was hearsay and should not have been admitted for the truth of the matter asserted (*i.e.,* that the

device can only be used once).  *Cf. Lewis*, 991 F. Supp. 2d at 755-56 (excluding as irrelevant and to avoid "the very substantial dangers of misleading the jury" the fact that a device was cleared by the FDCA 510(k) process) (citing *Medtronic*, 518 U.S. at 493).

The FDA approved the label pursuant to the Section 510(k) process.  That process is "focused on *equivalence*, not safety." *Medtronic*, 518 U.S. at 493 (noting that the civil defendant "exaggerated the importance of the § 510(k) process and the FDA's letter [approving a device under it]").  Specifically, the FDCA requires manufacturers of most medical devices to obtain from the FDA either (1) premarket approval ("PMA") of the device and its intended use labels; or (2) a conclusion that the device and its intended uses are "substantially equivalent" to a device already on the market.  *See id*. at 477-78.  The latter provision is known as "premarket notification" or the "Section 510(k) process." *Medtronic*, 518 U.S. at 478.  "[I]n contrast to the 1,200 hours necessary to complete a PMA review, the § 510(k) review is completed in an average of only 20 hours." *Id*. at 479.  Thus, "[t]he attraction of substantial equivalence to manufacturers is clear. [Section] 510(k) notification requires little information, rarely elicits a negative

response from the FDA, and gets processed very quickly." *Id*. (internal quotation marks omitted). Therefore, the fact that a label was approved pursuant to the Section 510(k) process does not establish that a device is unsafe if used in a manner contrary to the label; it merely establishes that the manufacturer did not seek to modify the intended uses (including frequency of use) from a similar device already on the market. *Cf. id*. at 478-79.

Because the 510(k) label relates to "equivalence, not safety," *id*. at 493, the label cannot establish that the devices were unsafe if used more than once. *Cf. Lewis*, 991 F. Supp. 2d at 755-56. Without any evidence of patient harm, any evidence that any specific device was contaminated, or any expert opinion testimony that the devices could not be cleaned or that Dr. Jackson's cleaning process was not effective, a reasonable jury could not have found the evidence sufficient to prove that the devices were *in fact* adulterated. Accordingly, the FDCA conviction must be dismissed for insufficiency of the evidence.

## C. The district court erroneously prohibited Dr. Jackson from presenting a complete defense.

The trial court also erroneously prohibited Dr. Jackson from presenting a complete defense. It did so in at least two ways: (1) by

refusing to allow Dr. Jackson to demonstrate how she cleaned the devices; and (2) by prohibiting Dr. Jackson from introducing government records, such as CDC articles, which show why Dr. Jackson believed that it was appropriate to re-use devices, even those labeled as single-use.

"The Supreme Court has clearly established that an integral part of the right to present a complete defense is a defendant's right to testify, on her own behalf, about circumstances bearing directly on her guilt or innocence or the jury's ascertainment of guilt." *Fieldman v. Brannon*, 969 F.3d 792, 801 (7th Cir. 2020) (cleaned up). While the defendant's right to testify is "fundamental" and rooted in the Constitution, *Rock v. Arkansas*, 483 U.S. 44, 49-53 (1987), it "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process," *id.* at 55. "But restrictions of a defendant's right to testify may not be arbitrary or disproportionate to the purposes they are designed to serve." *Id.* at 55-56.

A trial court's decisions to exclude or limit testimony and other evidence are reviewed for abuse of discretion. *United States v. Gallagher*, 90 F.4th 182, 195 (4th Cir. 2024). A trial court abuses its discretion when it commits an error of law, including erroneously finding evidence to be

hearsay or to be irrelevant or to be expert testimony. *Cf. id.* (hearsay determination is a legal ruling). Reversal is required if such errors are not harmless. *See id.* at 197. If the error rises to a constitutional level, the Government must prove harmlessness beyond a reasonable doubt. *See, e.g.*, *United States v. Ferguson*, 752 F.3d 613, 618 (4th Cir. 2014).

Because the limitations here were arbitrary and disproportionate, and because the trial court legally erred by concluding that the excluded evidence was expert testimony, irrelevant, and hearsay, the trial court abused its discretion. These errors were not harmless.

### 1. Preventing Dr. Jackson from demonstrating her cleaning and sanitation process was reversible error.

The heart of this case was Dr. Jackson's re-use of the balloon sinuplasty device in treating her patients and the potential that the reused devices were contaminated. Dr. Jackson attempted to show the jury that the devices were sufficiently cleaned and therefore not injurious to health. JA3077-3082. But because it accepted the Government's defective *per se* theory, the trial court prohibited Dr. Jackson from demonstrating that process. JA3077-3082.

Specifically, Dr. Jackson attempted to testify about her cleaning protocol and attempted to offer into evidence a video showing how she

cleaned the device. Her counsel informed the Court of the video's contents:

> So what was demonstrated was how the device was cleaned. . . .[A] sterile needle, syringe was taken and squirted into this part to make it squirt out this part. A brush – this was soaked first in a soap called Cidex and washed off up and down, and then finally rinsed off in potable water, not sterile water because the glutaraldehyde is allowed to be washed off in potable water and then submerged in a tub like this of gltuaraldehyde. Then . . . after the timer is set, this is all done in real-time, the date stamp is there, the time stamp is there. This device is taken out. It's put in the second tub of [Cidex] OPA. Timer is set, real-time, date stamp on the video, and then it is dried off.

JA3078-3079. The trial court prevented her from offering this testimony and video, though, ruling that such testimony was expert testimony that was prohibited by the Court's scheduling order. JA3080. The trial court so held even though it allowed Government lay witnesses to use a video demonstrating how the device might become contaminated. *See, e.g.*, JA1269-1274, JA1282-1285.

Dr. Jackson's demonstration was not expert testimony. She was demonstrating her cleaning process, which went to the heart of the case of whether the devices, once cleaned, were safe. Particularly in the face of allowing Government lay witnesses to use a video to show how the device might become contaminated, it was an abuse of discretion to

prevent Dr. Jackson from showing the jury how she cleaned and sanitized the devices.  This ruling left the jury with a one-sided presentation that may well have swayed the jury to convict.  Accordingly, the trial court's abuse of discretion in excluding the video was reversible error.

> **2. Preventing Dr. Jackson from showing why she believed that reusing devices was legally appropriate was also reversible error.**

The trial court also erroneously and prejudicially prohibited Dr. Jackson from introducing CDC documents that show that 20-30 percent of hospitals re-use single use devices, and that show Dr. Jackson's cleaning process to be consistent with CDC guidelines. *See* JA3155-3158.

The trial court excluded these documents based on the erroneous conclusion that it was irrelevant whether Dr. Jackson believed the devices to be safe. JA3155-3158.  That ruling was incorrect.  A person who believes their conduct to be legitimate is far less likely to engage in a scheme to defraud or mislead or cover up such conduct.  Dr. Jackson was charged not just with adulteration, but instead adulteration *with intent to defraud or mislead. See* JA62. Certainly, if the Government proved that she subjectively believed the devices to be unclean or unsafe, that would be relevant to whether she adulterated with bad intent.

Conversely, her belief that the devices were clean and safe undermined the Government's proof of intent to defraud or mislead. It was therefore relevant and the trial court's exclusion of this evidence was reversible error.

The district court also ruled that the documents were hearsay. JA3129, JA3156. That was wrong as well, because the documents were offered not for their truth, but for the effect they had on Dr. Jackson— that they led her to believe that reusing single use devices that are cleaned and sanitized according to CDC guidelines is allowable, and that she therefore had no motive or intent to defraud or mislead her patients. JA3155-3158.

The erroneous exclusion of these documents left the jury with the inaccurate impression that there was no reasonable basis for Dr. Jackson to believe that her conduct was legitimate. An accurately informed jury may well have had a reasonable doubt as to whether Dr. Jackson had a reason to cover up her re-use of devices, and thus may have acquitted her of the adulteration offense, which required proof of intent to defraud or mislead, as well as each of the other counts, which all required culpable intent, *see* Section II below.

\* \* \*

Individually and collectively, these erroneous evidentiary rulings prohibited Dr. Jackson from presenting a complete defense and constituted reversible error.

## D. The FDCA instructions were erroneous and prejudicial.

The Court "review[s] *de novo* whether jury instructions incorrectly stated the law." *United States v. Smithers*, 92 F.4th 237, 245-46 (4th Cir. 2024). "On direct appeal regarding a preserved, meritorious objection to jury instructions, the defendant is entitled to relief unless the error is harmless beyond a reasonable doubt." *United States v. Said*, 26 F.4th 653, 660 (4th Cir. 2022).

The trial court reversibly erred both by denying Dr. Jackson's requested instructions and by instructing that it is "irrelevant" that no patients were harmed. Individually and collectively, these erroneous instructions require vacatur.

### 1. The trial court's denial of Dr. Jackson's requested FDCA instructions requires reversal.

Dr. Jackson requested an instruction on Section 396. JA239. She also requested a theory of defense instruction that "[i]n order to find the defendant guilty of the offense [FDCA count] . . . [the jury] must find that

the government has proven beyond a reasonable doubt that the defendant was not acting within the scope of h[er] licensed practice as a medical doctor within a legitimate doctor-patient relationship when she re-used the medical devices at issue in this case." JA238. And she requested an instruction that "the re-use by a licensed physician of a . . . medical device labeled by the manufacturer as a single-use device is not, in and of itself, unlawful." JA241.

These were correct statements of the law. *See* Sections I.A.2-3 above; § 396; *Caplinger*, 784 F.3d at 1344. The trial court not only erroneously declined to give these requested instructions, but it also instructed the opposite—that is, that the Government proves the charged offense of adulteration with the intent to defraud if it proves that Dr. Jackson did "not disclose to a patient that she was reusing a single-use . . . device that she had used on a different patient and that one of her reasons for doing so was to enrich herself." JA3516. The Government cannot carry its burden of proving that the failure to give these requested instructions was harmless beyond a reasonable doubt. The trial court failed to instruct the jury on law that went to the heart of the case. If the jury had received either the Section 396 instruction or the related theory of defense

instruction, the jury could not have convicted Dr. Jackson because there was no evidence that her conduct was outside a legitimate doctor-patient relationship. *Cf. Gallagher*, 90 F.4th at 194 ("[J]urors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law." (cleaned up)). The failure to give the requested instruction that reusing a device was not *per se* unlawful was also highly prejudicial because that correct instruction would singlehandedly counter the Government's central prosecution theory. *Cf. id.*

Accordingly, the Government cannot carry its burden of proving that these jury instruction errors were harmless.

## 2. The trial court's erroneous "irrelevance" instructions require vacatur.

The trial court instructed the jury that it was "irrelevant" that no patient was harmed and that Dr. Jackson believed the devices were clean. JA3161, JA3167, JA3515. These erroneous legal instructions were prejudicial and thus require reversal.

When Dr. Jackson attempted to show the jury that she tested for cross-contamination (to ensure that her cleaning method worked and protected patients), the trial court instructed the jury that this evidence was "irrelevant," stating,

I'll just remind you again. *It is irrelevant. . . .* The United
States does not have to prove in Count 1 that a single patient
got sick because of the defendant's process.

JA3167 (emphasis added). When Dr. Jackson managed to start

explaining why she believed that the devices were clean, the government

objected and the trial court announced, unprompted,

Ladies and gentlemen, the United States in connection with
Count 1 does not have to prove that a single patient got sick
through the defendant's re-use of a single-use device. It is not
an element of the crime.

JA3161.

And when Dr. Jackson attempted to introduce FDA documents and

other documents to show her good faith belief that the devices were clean

and that her conduct was lawful, the trial court prohibited their

introduction, stating that adulteration is a strict liability offense, and

that the intent to defraud element elevating the misdemeanor offense to

a felony has "nothing to do with the sterility of the device." JA3157

(cleaned up).

Finally, when Dr. Jackson's counsel asked Dr. Jackson during

direct examination, "Are you concerned with making sure that your

patients are not exposed to anything that would be injurious to their

health?" the trial court interrupted, "Again, ladies and gentlemen, as I

told you a number of times, it's not an element of Count 1 at all." JA3223.

These instructions—many of which were *sua sponte*—erroneously prohibited Dr. Jackson (1) from showing that the devices were not adulterated, and (2) from demonstrating that she had no motive to—and thus did not—adulterate the devices "with the intent to defraud" or otherwise scheme to cover up the fact that she was using dirty devices, as alleged in the other counts.

The trial court's instructions also misinformed the jury about how they should consider evidence related to adulteration. Courts have held that whether something is "held under insanitary conditions" is determined from the totality of the circumstances. *United States v. Am. Mercantile Corp.*, 889 F. Supp. 1058, 1076 (W.D. Tenn. 2012); *see also, e.g.*, *United States v. Scotty's, Inc.*, 173 F. Supp. 3d 549, 554 (E.D. Mich. 2016). In *American Mercantile Corp.*, the court analyzed whether food products that had been contaminated by rodents and other pests were "held under insanitary conditions." While recognizing that "actual contamination is not required," *id.* at 1075, the court noted that "proof of actual contamination is *prima facie* evidence that the food has been held

under insanitary conditions," *id.* at 1076. The court looked at the totality of the circumstances in concluding that there was a reasonable probability that the food was contaminated with filth and that the food had therefore been held under insanitary conditions and was "adulterated." *Id.* at 1076-80.

Here, the trial court turned this analysis on its head. The trial court instructed the jury that proof of actual contamination was "irrelevant." *See, e.g.*, JA3161, JA3515. Given that actual contamination is *prima facie* evidence of whether the conditions were insanitary, the absence of actual contamination is plainly relevant to the totality of the circumstances about whether conditions are insanitary.

These erroneous "irrelevance" instructions were also prejudicial. The Government did not present any expert testimony establishing that Dr. Jackson's cleaning process was ineffectual, but instead relied only on the label and its defective *per se* theory to prove the offense. A properly instructed jury would have had a reasonable doubt about whether the devices were, in fact, injurious to health since they were cleaned and sanitized pursuant to CDC guidelines, were tested to ensure no cross-contamination occurred, and caused no harm to patients. JA3106-3109,

JA3232-3233.  A properly instructed jury would also have reasonably doubted whether Dr. Jackson intended to defraud patients when she did not believe that she had any reason to cover up her conduct.  Accordingly, these "irrelevance" instructions also require reversal.

**E. The Government's Golden Rule argument requires reversal.**

Compounding these other errors was the Government's closing argument in which the prosecutor invoked a "Golden Rule argument," asking the jury to decide the case as they would want it decided if they were the victim.  *Werner v. Upjohn Co.*, 628 F.2d 848, 854 (4th Cir. 1980) (cleaned up).  The prosecutor argued:

> If you could have a device that had been here fully coated and contaminated with another person's blood and mucous, or you could have that perfectly pristine device, which one would you want? Which one would you choose?

> Let me add another factor to your choice. What if I told you that this device was tested to ensure it was completely sterile -- this one -- tested to make sure it's completely sterile; that this one, because it had never been used, had zero risk, zero risk that another human's bodily fluids would get inside your body. Zero risk of that happening. Would that impact your decision?

JA3418.  The Government also answered the question: "This [brand new device] is what you would want.  This is what I would want."  JA3417.

The Court analyzes *de novo* whether a prosecutor's argument was improper. *United States v. Diaz-Castro*, 752 F.3d 101, 110 (1st Cir. 2014). Plain error review typically applies to errors not objected to below; however, "such an objection is not required in this circuit" for Golden Rule arguments. *Werner*, 628 F.2d at 854 (citing *Leathers v. General Motors Corp.*, 546 F.2d 1083 (4th Cir. 1976)). Accordingly, the Court must reverse unless the Government proves that the Golden Rule argument was harmless beyond a reasonable doubt.[6] *See, e.g., United States v. Herron*, 432 F.3d 1127, 1136 (10th Cir. 2005).

Because the Golden Rule arguments are categorically improper, the only question is prejudice. And the Government's argument was immensely prejudicial. It suggested that the jury was to decide Dr. Jackson's guilt or innocence based on what the jurors themselves would choose if they were a patient of Dr. Jackson. It was a multiple-part argument with an initial premise—"If you could have a device"—to which the prosecutor added, "Let me add another factor to your choice." The emotional theme of the prosecution from beginning to end was "blood, pus, and mucous." JA731. The prosecutor repeated this phrase four

---

[6] Even if plain error review applies, that standard is met.

times in the first minute of the opening, continued with the refrain throughout the trial, *see, e.g.*, JA1092, JA1102, JA1254, JA1338, JA1573 ("pus"), JA2081 ("pus or mucous"), and, having enflamed the jury with this theme throughout the case, it then told the jury to decide Dr. Jackson's guilt based on whether, if they were the victims, they would want to be operated on with such a device.

In *Leathers v. Gen. Motors Corp.*, 546 F.2d 1083, 1085 (4th Cir. 1976), the Court reversed a jury verdict for much less. There, the lawyer asked the jury, "[H]ow much [in] dollars would [the plaintiff's injury] be worth to you[?]" *Id.* That argument was alone sufficient to require a new trial. *Id.* at 1085-86.

Here, the argument focused much more on what the jurors would choose *for themselves*—asking the jurors to make "your choice" as to Dr. Jackson's guilt or innocence by deciding whether the jurors would individually, as the patient, tolerate the "risk that another human's bodily fluids would get inside *your* body." JA3418. This argument is obviously improper and was highly prejudicial. It therefore requires a new trial on all counts.

\*    \*    \*

The foregoing errors individually and cumulatively require the vacatur of the FDCA conviction. As discussed below these errors also require vacatur of the other convictions.

## II. THE FOREGOING ERRORS REQUIRE REVERSAL OF ALL OF THE CONVICTIONS.

Once one or more errors have been established, the question becomes whether those errors prejudiced the defendant and, if so, to what extent. Thus, the prejudice inquiry requires an analysis of each conviction. *See United States v. Barringer*, 25 F.4th 239, 247 (4th Cir. 2022).

The inquiry differs slightly based on the type of error. Constitutional errors require reversal of all convictions unless the Government proves that they are harmless beyond a reasonable doubt as to any specific conviction. *See, e.g.*, *Ferguson*, 752 F.3d at 618. Only in "rare situations in which the reviewing court can be confident that a [constitutional] error did not play any role in the jury's verdict" can such an error not require vacating all counts. *Connecticut v. Johnson*, 460 U.S. 73, 87 (1983); *see also United States v. Lindberg*, 39 F.4th 151, 164 (4th Cir. 2022) (applying *Johnson* and vacating all counts). Non-constitutional errors require reversal of all convictions unless, as to any

particular conviction, "the Government demonstrates that the error did not have a 'substantial and injurious effect or influence in determining the jury's verdict,'" *United States v. Ibisevic*, 675 F.3d 342, 349–50 (4th Cir. 2012) (cleaned up).

Prejudice exists where "evidence admitted to support a reversed count prejudiced the remaining counts." *Barringer*, 25 F.4th at 247 (cleaned up). For example, where "the challenged evidence would have been inadmissible without the [erroneous] counts," and where that evidence was prejudicial to other counts, the other counts must be dismissed. *Id.* at 247-48.

That test is met here. Quite simply, the jury erroneously heard evidence and instructions supporting the Government's erroneous position that Dr. Jackson's re-use of devices made her a criminal, a corrupt doctor, and a danger to the public. The jury would not have heard that evidence but for the trial court's erroneous refusal to dismiss the FDCA charge, and that evidence was highly prejudicial to each of the other counts, each of which required the Government to prove culpable intent (*i.e.*, lack of good faith). Therefore, vacatur of all counts is required.

Similarly, because the jury was erroneously prohibited from hearing evidence and instructions that supported Dr. Jackson's good faith as to the FDCA charge, and because intent was a "central issue" as to all charges, the erroneous exclusion of evidence (as described in Section I.C & I.D above) also requires vacatur of all counts. *See Gallagher*, 90 F.4th at 197 (where intent was a "central issue" as to all counts, improperly excluding evidence corroborating good faith required reversal of all counts).

The Government also explained that all the charges should be treated as a whole:

> the allegations with respect to [the FDCA] are interwoven quite intentionally with the [other counts] because it was [alleged to be] one big scheme. That's been our allegation throughout, and we stand by that.

JA3761. This "interwoven" nature of each of the charges was borne out in the Government's trial evidence and theory, which used the allegedly unjustifiable device "re-use" to great effect as propensity, negative character, and motive evidence in support of the other counts. It claimed (erroneously) that Dr. Jackson acted intentionally and wrongfully by not following the device label, and that she engaged in this unjustifiable and *per se* illegal conduct for the sole purpose of illegally profiting. JA3421,

3485. Having erroneously painted Dr. Jackson as a corrupt doctor for not following device labels, it contended that her decision to, in many cases, not collect coinsurance must also have been a corrupt effort to profit by paying the patient "kickbacks," as opposed to a kindhearted effort to reduce the financial burden of her elderly, often relatively poor patients (Counts 2-11). *See* JA3423-3426. It also presented Dr. Jackson's allegedly corrupt re-use of the devices to argue that the jury should reject Dr. Jackson's good faith explanation related to Counts 12-19. That explanation was that she did not intend to submit false or fraudulent records in response to audits, but instead thought she was supposed to respond to the audit "like a lawyer would," *i.e.*, with information supporting that she actually performed the procedures (which she had) (Counts 12-19). *See* JA3209; *see also* JA3207, JA3211, JA3293. And, of course, the alleged FDCA violation, along with each of the other charges, was an alleged purpose of the conspiracy count (Count 20). JA3439-3440. Thus, the FDCA evidence, which would not have been admitted in an error-free proceeding, was highly prejudicial as to each of the other counts.

Because the evidence on the FDCA charge was highly prejudicial as to the other counts and would not have been admissible but for the trial court's errors as to the FDCA count, the Government cannot meet its burden of proving that those errors were harmless as to the other counts. *See, e.g., Barringer*, 25 F.4th at 247-48. Similarly, the trial court's erroneous limitation of Dr. Jackson's testimony also directly prohibited her from demonstrating and corroborating her defense of good faith, which was critical to each of the other counts because they all required the Government to prove criminal intent. *See Gallagher*, 90 F.4th at 197. Therefore, all convictions must be vacated.

## III. THE AGGRAVATED IDENTITY THEFT CHARGES AND CONVICTIONS DO NOT SURVIVE THE SUPREME COURT'S DECISION IN *DUBIN*.

In *Dubin v. United States*, 599 U.S. 110 (2023), the Court addressed the meaning of the "opaque language" of the Aggravated Identity Theft statute. *Id.* at 129. The Court found the Government's long utilized reading of this offense to be of "staggering [over]breadth"—that is, that a person "uses" a person's means of identification if the identification "'facilitates or furthers the predicate offense in [any] way." 599 U.S. at 117, 129. This was the definition the Government used—and the trial

court erroneously endorsed—in this case. But in *Dubin*, the Court held that "[t]he text and context of the statute do not support the Government's boundless interpretation." *Id*. at 114. Instead, the conduct must rise to the level of an "aggravated" form of "identity theft" to be within the purview of the statute. *See id*. at 120. Ultimately, the Court held that, to constitute Aggravated Identity Theft, the alleged misuse of identification must have been "at the crux of what makes the underlying offense criminal." *Id*. at 114.

## A. The indictment failed to state an offense in light of *Dubin*.

Because Dr. Jackson challenged the sufficiency of the indictment pretrial, the Court reviews the sufficiency of the charges *de novo*. *See, e.g., Brewbaker*, 87 F.4th at 572.

"One of the central purposes of the indictment is to provide sufficient notice to allow the accused to prepare a defense as to every element of the indicted crime." *United States v. Camara*, 908 F.3d 41, 47 (4th Cir. 2018) (cleaned up); *see also United States v. Kingrea*, 573 F.3d 186, 193 (4th Cir. 2009). This purpose includes ensuring that the defendant can prepare a defense as to any "essential facts" that the Government must prove for the jury to convict. *United States v. Perry*,

757 F.3d 166, 171 (4th Cir. 2014). The indictment must also ensure that the grand jury actually found all of the essential facts necessary to constitute the offense. *Kingrea*, 573 F.3d at 193. When an indictment fails to provide sufficient factual allegations to provide these substantive and notice protections, the indictment fails to state an offense and is defective under the Fifth and Sixth Amendments. *See id.* In light of *Dubin*, the Aggravated Identity Theft charges failed to provide these constitutional protections.

Specifically, the grand jury did not find that the alleged misuse of the names, initials, and/or forged signature was what made the underlying offense (submitting false records) criminal. Absent this allegation, the Fifth Amendment's grand jury protection was not provided, and Dr. Jackson was not afforded the notice protection required by due process and the Sixth Amendment.

The Government may argue that the indictment's formalistic recitation of the statutory text and identification of the means of identification and the date ranges at issue insulate the charge from dismissal. Where statutory terms or generic elements are ambiguous, though, the indictment must "descend to particulars" and "also contain a

statement of the *essential facts* constituting the offense charged." *Perry*,

757 F.3d at 171 (cleaned up). *Dubin* makes clear that the element of

"using" a means of identification "during and in relation to an[]

[enumerated] felony" is ambiguous. *Dubin*, 599 U.S. at 124-27. Thus,

merely reciting vague statutory language does not ensure that the grand

jury found the "essential fact" that the alleged misuse of identification is

the crux of what made the underlying conduct criminal. Absent such an

allegation, the charge did not apprise Dr. Jackson of all facts she needed

to defend against, nor did it ensure that the grand jury actually found

those essential facts. Counts 15 and 16 are therefore constitutionally

defective, and the trial court erred in failing to dismiss these counts.

### F. The jury instructions were plainly erroneous and require reversal.

The jury was not informed that it had to find the means of

identification to be "at the crux of what makes the underlying offense

criminal." *Dubin*, 599 U.S. at 114. Therefore, the instructions were

plainly erroneous.[7]

---

[7] Plain error review applies to this jury instruction error. *See United States v. Jennings*, 496 F.3d 344, 351 (4th Cir. 2007).

This error affected Dr. Jackson's substantial rights because there is a "reasonable probability" that, if the trial court had correctly instructed the jury, Dr. Jackson would have been acquitted. "A reasonable probability is a probability sufficient to undermine confidence in the outcome," and it need not rise to the level of a "preponderance of the evidence to have determined the outcome." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). The question is whether, absent the error, a reasonable juror may have "had a reasonable doubt respecting guilt." *Id.* at 695.

This standard is met. Counts 15 and 16 each alleged that a single patient's means of identification—identified as "name," "initials," and "forged signature"—were used on a single "backdated declaration."[8] JA71-72. The underlying felony was the submission of a large volume of allegedly false "patient medical records" for numerous patients treated over several months, as alleged in Count 14. JA69-70. This single declaration produced with hundreds of other allegedly false documents did not "make the conduct criminal." Indeed, even if the declaration had

---

[8] Notably, the declarations did not contain any false information, but instead contained a forged signature and an incorrect date.

been the only document submitted, the name, initials, or signature would not "make the conduct criminal." Instead, what made the conduct criminal was submitting documents prepared after the fact but presented to auditors as if they were preexisting records. *See* JA69.

Notably, Count 14—which charged the predicate felony for the Aggravated Identity Theft charge—did not allege that Dr. Jackson submitted *forged* declarations. JA66-71. Rather, it alleged that, in response to the audit, Dr. Jackson "altered existing documentation and created new documentation." JA69. Regarding declarations, it alleged that Dr. Jackson and her staff "acquired patient signatures after the fact and backdated them to appear as though they had been in the patient file prior to the audit." JA70. In other words, the alleged forgery or use of identification was not at the crux of what made Count 14 criminal; it was not even alleged in Count 14.

The Government also did not argue that the forged declarations were the crux of the criminality of Count 14. Rather, the prosecutor told the jury:

> Do not get hung up on the term "aggravated identity theft." That does not mean that somebody has to steal someone's wallet. It simply means that if you come into possession of someone's means of identification, their signature, their

name, identifying information and then you use it in a way that goes beyond what you're allowed to use it for[.]

JA3437. Of course, that summary of the instructions was erroneous in light of *Dubin*, and a properly instructed jury could well have determined that these isolated allegedly forged declarations were not the crux of the false records offense charged at Count 14.

Accordingly, there is a "reasonable probability" that a jury would have acquitted Dr. Jackson of aggravated identity theft if it had been correctly instructed. Thus, the aggravated identity theft convictions must be vacated.

## IV. THE COURT SHOULD ASSIGN THIS CASE TO A DIFFERENT JUDGE ON REMAND.

When remanding a case, this Court may reassign it to a different judge where "the appearance of fairness and impartiality is best advanced by reassignment." *United States v. McCall*, 934 F.3d 380, 384 (4th Cir. 2019) (cleaned up). Because the focus is on the public perception, the Court's "faith in [the district court's] objectivity does not affect [the] decision." *United States v. Bradley*, 455 F.3d 453, 465 (4th Cir. 2006)

When considering such requests, the Court considers the following factors:

(1)  whether the original judge would reasonably be expected to have substantial difficulty in putting out of his mind previously expressed views or findings determined to be erroneous or based on evidence that must be rejected;

(2)  whether reassignment is advisable to preserve the appearance of justice; and

(3)  whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

*McCall*, 934 F.3d at 384 (cleaned up).

This Court's "usual practice" of reassigning cases to a different judge when the Court reverses a conviction based on a district court's involvement in plea discussions is instructive. *United States v. Braxton*, 784 F.3d 240, 247 (4th Cir. 2015) (citing cases). Doing so is the "usual practice" because "regardless of the judge's objectivity, it is the defendant's perception of the judge that will determine whether the defendant will feel coerced [on remand] to enter a plea." *Bradley*, 455 F.3d at 465 (cleaned up

Finally, remand to a new judge is appropriate when the trial judge made explicit credibility determinations about the defendant. *See Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 142 (2d Cir.

2007) (remanding to a new judge because the prior judge found the defendant's testimony to be "a lie"); *Earp v. Cullen*, 623 F.3d 1065, 1072 (9th Cir. 2010) (remand to a new judge is warranted where trial court "made explicit credibility findings").

These factors support remand to a new judge in this case. The trial court expressed its view that reusing devices labeled for single use is "shameful," JA3941. It explained its belief:

> [O]ne of the . . . expectations that we have as a society certainly is that to the extent that there are medical devices that are provided for use in connection with . . . [a] surgical procedure, to the extent that there's some kind of instruction that it's a single-use device, it's just implicit and understood that a doctor is going to [follow] that.

JA3935. Of course, as discussed above, that intuition is wrong. Doctors may re-use devices labeled as single use, and doing so is not "shameful."

The trial court also expressed its "view" that, by reusing devices labeled as single use, "the defendant lost her way and was consumed by greed for a long period of time." JA3942. Of course, as noted, reusing single use devices is not illegal. A judge who found that doing so was necessarily the result of her being "consumed by greed" would reasonably be expected to have difficulty setting such opinions aside.

The trial court also repeatedly instructed the jury that it is irrelevant and of no moment that no patients were hurt or that Dr. Jackson believed the devices to be clean—which indicates that the trial court developed a strongly held belief in this respect. And the trial court made comments to a witness in a way that indicated the court's own personal belief that it is wrong for a doctor to use re-use a device labeled for single use. JA2946-2947. Specifically, when one of Dr. Jackson's witnesses was testifying that hospitals and doctors' offices routinely reuse devices labeled as "single use," the trial court interjected, asking:

> THE COURT: You have doctors that reuse single-use devices on you, you let that happen? Yes or no.
>
> THE WITNESS: I don't let it happen.

The trial court then commented:

> THE COURT: You don't let it happen because you pay attention.

JA2946-2947.

The trial court also heard from, and was moved by, numerous allocution statements of the purported victims of the FDCA charge, *see* JA3774-3782, JA3940—which statements would not be presented even if Dr. Jackson were retried and convicted of the charges other than the defective FDCA offense.

And the trial court announced that, even if it miscalculated the guidelines, it would vary to this same 25-year sentence, stating, "This is the sentence sufficient but not greater than necessary for Anita Louise Jackson in light of all the 3553(a) factors that I have discussed." JA3948.

Finally, the trial court found that Dr. Jackson committed perjury in her testimony in four specific ways—each of which relied on the trial court making explicit witness credibility determinations. JA3773. As the Second Circuit recognized, "[w]hether any person can take an objective second look at testimonial evidence after [determining that the defendant committed perjury] is questionable, but certainly the appearance of justice would be well-served by reassignment on remand." *Shcherbakovskiy*, 490 F.3d at 142; *see also Earp*, 623 F.3d at 1072.

Both the difficulty in setting aside previously expressed opinions and findings and the appearance of justice would favor reassignment to avoid the perception that these prejudicial determinations have infected the proceedings on remand. And based on the trial court's findings and expressions of opinion, Dr. Jackson's "perception of the judge" has been affected in a way that "will determine whether [she] will feel coerced [on

remand] to enter a plea." *Bradley*, 455 F.3d at 465 (quoting *Barrett*, 982 F.2d at 196).

Lastly, reassignment would not "waste" resources or entail "duplication out of proportion to any gain in preserving the appearance of fairness." *McCall*, 934 F.3d at 384. Any pretrial orders applicable after remand are available for a new judge to review and rely upon, and, since the dominant theory of prosecution was defective, the fairness of the proceeding on remand requires the district court on remand to look at the case anew.

## CONCLUSION

Dr. Jackson was sentenced to 25 years in prison after a prosecution dominated by a fundamentally flawed legal theory that statutorily protected conduct is actually a *per se* crime and following a unconstitutionally defective trial. For reach of the foregoing reasons, this Court should vacate each of Dr. Jackson's convictions, dismiss the FDCA charge and the Aggravated Identity Theft charges, and remand this case to a new judge for further proceedings.

## REQUEST FOR ORAL ARGUMENT

Oral argument is appropriate because this case presents issues of first impression in this Circuit as well as a detailed factual record and a

complicated statutory and regulatory landscape. Accordingly, Dr. Jackson believes that oral argument would help the Court understand and decide the issues presented.

Dated March 14th 2024,      Respectfully submitted,

/s/ Elliot S. Abrams
Elliot S. Abrams
CHESHIRE PARKER
  SCHNEIDER, PLLC
133 Fayetteville Street
Suite 400
Raleigh, NC 27601
(919) 833-3114

Ripley E. Rand
WOMBLE BOND
  DICKINSON (US) LLP
555 Fayetteville Street
Suite 1100
Raleigh, NC 27601
(919) 755-8125
ripley.rand@wbd-us.com

*Counsel for Appellant*

# CERTIFICATE OF COMPLIANCE

1.     This document complies with type-volume limits of this Court Order on March 4, 2024 for a word allowance of 16,000 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

    This document contains <u>15,828 words</u>.

2.     This document complies with the typeface requirements because:

    This document has been prepared in a proportional spaced typeface using <u>Microsoft Word</u> in <u>14 point Century Schoolbook</u>.

Dated: March 14, 2024         Respectfully submitted,

                              <u>/s/ Elliot S. Abrams</u>
                              Elliot S. Abrams

                              *Counsel for Appellant*