NO: 23-4467(L)

# In The
# United States Court of Appeals
## For The Fourth Circuit

UNITED STATES OF AMERICA,
                    Appellee

v.

ANITA LOUISE JACKSON
                    Appellant

On Appeal from the United States District Court
For the Eastern District of North Carolina
At Raleigh

## BRIEF OF *AMICUS CURIAE*
## PHYSICIANS AGAINST ABUSE
## IN SUPPORT OF DEFENDANT-APPELLANT

Eric O. Husby, Esq.
3632 Land O Lakes Blvd, Suite 105-8
Land O Lakes, FL 34639
PH: 813.597.8181
ehusby@husbylegal.com

*Counsel for Amicus Curiae*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __23-4467__        Caption: __US v. Jackson__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Physicians Against Abuse__
(name of party/amicus)

_____

 who is _____amici curiae_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.     Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.     Does party/amicus have any parent corporations?                            ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
       other publicly held entity?                                               ☐YES ☑NO
       If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct
     financial interest in the outcome of the litigation?                    ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected
     substantially by the outcome of the proceeding or whose claims the trade association is
     pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
     party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
     caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
     corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
     If yes, the United States, absent good cause shown, must list (1) each organizational
     victim of the criminal activity and (2) if an organizational victim is a corporation, the
     parent corporation and any publicly held corporation that owns 10% or more of the stock
     of victim, to the extent that information can be obtained through due diligence.

Signature:  /s/ Eric O. Husby, Esq.                         Date:   4/18/2024

Counsel for: Physicians Against Abuse

- 2 -

Print to PDF for Filing

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT

TABLE OF CITATIONS ............................................................ iii

INTEREST OF AMICUS CURIAE.................................................. 1

INTRODUCTION .................................................................... 3

SUMMARY OF THE ARGUMENT ............................................. 5

ARGUMENT .......................................................................... 6

I.  REUSE OF SINGLE USE MEDICAL DEVICES IS NOT PER SE IMPROPER AND IS AN INSUFFICIENT BASIS ON WHICH TO CRIMINALIZE MEDICAL JUDGMENT ................................6

II.  THE FDA IS NOT AUTHORIZED TO REGULATE THE PRACTICE OF MEDICINE ...................................................10

III.  NO STATE LAW DETERMINATION HAS BEEN MADE THAT REUSE IN THIS CASE WAS ILLEGAL OR CONTRARY TO MEDICAL JUDGMENT ......................................................13

IV.  THE TRIAL COURT IMPROPERLY LIMITED DR. JACKSON'S ABILITY TO PRESENT HER DEFENSE AND RESTRICTED HER ABILITY TO PRESENT THE REUSE PROCESS AND ITS COST TO THE JURY .........................................................17

CONCLUSION .......................................................................21

CERTIFICATE OF COMPLIANCE ...........................................22

CERTIFICATE OF SERVICE....................................................22

# TABLE OF CITATIONS

**Cases**                                                                               **Page**

*Apter v. Dep't of Health & Hum. Servs.*,
    80 F.4th 579, 589 (5th Cir. 2023)……………………………….10,11

*Buckman Co. v. Plaintiffs' Legal Comm.*,
    531 U.S. 341, 350–51 (2001)……………………………………..12

*Caplinger v. Medtronic, Inc.*,
    784 F.3d 1335, 1344 (10th Cir. 2015)……………………………….6

*Dent v. West Virginia*,
    129 U.S. 114, 121–24, 9 S.Ct. 231, 32 L.Ed. 623 (1889)…………..12

*Ruan v. United States*
    142 S.Ct. 2370 (2022)…………………………………………….25

*United States v. Caronia*,
    703 F.3d 149, 153 (2d Cir. 2012)………………………………….12

**Statutes & Regulations**

21 U.S.C §841………………………………………………………..3

21 U.S.C. § 396…………………………………………………….10

N.C. Gen.Stat. § 90–2 (2005)………………………………………13

N.C. Gen.Stat. § 90–14(a)(6) (2005)………………………………13

N.C. Gen.Stat. § 150B–2(4b) (2005)………………………………13

Physicians Against Abuse, ("PAA" or "*Amicus*") was founded in 2019, by physicians with a board of directors consisting exclusively of physicians. It was formed in response to the astronomical rise in physician convictions involving wrongful accusations against physicians relating to the practice of medicine in the milieu of "pill mill" prosecutions. PAA recognized a concomitant increase in health care fraud indictments sending an inordinate number of physicians to unjustified, decades long, imprisonment. Further inquiries reveal that the United States has become the leading country in the world for incarceration of physicians for crimes relating to the practice of medicine.

*Amicus* assists physicians throughout the United States who become targeted by the federal government involving charges of prescription and/or health care fraud or any criminal charge arising out of the practice of medicine. *Amicus'* assistance varies based on the stage

[1] This brief has not been authored, in whole or in part, by counsel to any party in this appeal. No party or counsel to any party contributed money intended to fund preparation or submission of this brief. No person, other than *amicus curiae*, its members, contributed money that was intended to fund preparation or submission of this brief. All parties have consented to the filing of this brief.

of criminal proceedings. At the trial court level, *Amicus* assists physicians by helping physicians organize and assemble robust defense teams which includes informed lead counsel, an informed second chair with expertise in defense of physicians, retention of qualified experts and thorough medical investigation of the case to aid counsel in the presentation of the case before the jury.

At the appellate level, *Amicus'* role is generally limited to submitting *amicus* briefs to shed light on the problem of criminalizing (at the federal level) the practice of medicine within the scope of professional practice as in the instant case. *See PAA's amicus briefs in Ruan v. United States 20-1410 and also Ruan II, 22-1175.*

*Amicus'* objective is to end the undue criminalization of the practice of medicine. One example is that physicians' medical judgment and professional practice has increasingly been criminalized through federal prosecutions in the past decade. This was demonstrated in the decision of the United States Supreme Court in *Ruan v. United States* 142 S.Ct. 2370 (2022). Through *Ruan,* it became apparent that a statute intended for drug lords and cartels had been applied in federal prosecutions to convict hundreds of doctors and imprison them for decades by virtue of

prosecutorial overreach resulting from a misinterpretation of the "Except as otherwise authorized" language in 21 U.S.C §841. Today, hundreds of physicians remain in federal prison based, apparently, on that misinterpretation.

To achieve *Amicus*' objective to bring an end to criminalization of the practice of medicine, *Amicus* is preparing to present testimony before Congress Oversight Committee by presenting the astronomical number of physician cases where federal prosecutors have overreached not because there is a crime but because there is a prosecutorial wish list that has been fueled by the ongoing opioid crisis.

## INTRODUCTION

Dr. Anita Jackson was a licensed Ear Nose and Throat Surgeon, ("ENT"), otherwise known as an otolaryngologist. To attain this status, a physician is required to successfully complete four (4) years of medical school, followed by one (2) years of general surgical internship and four (4) years of specialized residency training dealing specifically with ENT diseases. Some of the most common diseases include sinus infections, collectively referred to as sinusitis.

Dr. Jackson fulfilled the requirements of becoming an ENT surgeon by attending four (4) years of medical school at University of Illinois College of Medicine, followed by surgical internship at Howard University and then by completing an ENT residency at University of Tennessee College of Medicine in 1997.

It is noteworthy that competitiveness of clinical training after medical school depends on the subspeciality that is sought. Admission to ENT specialty residency training is reputed to be as competitive as getting into an Ivy League law school. Dr. Jackson became board certified in otolaryngology in 1998 and became a Fellow of the American College of Surgeons in 1999, placing her among the elite group of surgeons who carry the credentials of "FACS".

Dr. Jackson testified extensively about the nature of her practice including her use of balloon sinusotomies as a less invasive procedure for patients with sinusitis which she also performed at different medical offices, requiring her mobility which necessitated that her surgical instruments also be mobile.

# SUMMARY OF THE ARGUMENT

*Amicus'* deep concerns over this prosecution are reflected in the arguments *Amicus* makes on behalf of Dr. Jackson herein. First, Amicus advances the argument that that "re-use" alone should not be deemed sufficient to criminalize Dr. Jackson's practice involving sinusotomies,[2] at a minimum not without examining and investigating whether the decontamination process of the sinus scopes employed by Dr. Jackson met the standard of care before each use and re-use.

Secondly, *Amicus* argues that because the FDA labels a surgical instrument as "single-use," that does not control medical practice and judgment, nor does such a designation limit the health care practitioner's authority to make an informed clinical decision on whether the surgical instrument can be properly re-used with the appropriate decontamination process.

Thirdly, *Amicus* argues that the prosecutors in this case did not adequately investigate this case because they did not seek an advisory

[2] The procedure of expanding the hollow bone space inside the nostrils which gets filled up with mucus and purulent material in patients who suffer from sinusitis.

opinion or declaratory statement of the licensing agency, North Carolina Medical Board, before criminalizing Dr. Jackson's "re-use" of sinus scopes. *Amicus* asserts that because Dr. Jackson's practice involving the re-use of sinus scopes was squarely regulated by the North Carolina Medical Board, the prosecutors were required to establish whether there was even a departure from the standard of care yet alone criminal behavior. *Amicus*' final argument is the lack of evidence that the prosecutors presented regarding the costly decontamination process that came along with the "re-use" process. Ignoring the cost involved in this decontamination process, the district court judge was quick to label Dr. Jackson "greedy."

## ARGUMENT

## I. REUSE OF SINGLE USE MEDICAL DEVICES IS NOT *PER SE* IMPROPER AND IS AN INSUFFICIENT BASIS ON WHICH TO CRIMINALIZE MEDICAL JUDGMENT

Dr. Jackson's reuse of sinus scopes, even if contrary to FDA's label, was not within the purview of the FDA, and mere re-use without more does not implicate that there was departure from the standard of care. When Congress enacted the Federal Food, Drug, and Cosmetic Act

("FDCA"), Congress "went out of [its] way to protect the liberty of doctors and patients to use approved devices in any manner they wish— including [contrary to] label." *Caplinger v. Medtronic, Inc.*, [784 F.3d 1335, 1344](#) (10th Cir. 2015) (Gorsuch, J.).

Surgical instruments are regularly re-used in the medical field at hospitals and ambulatory surgery centers across this nation. There are not enough surgical instruments in production in this country such that surgical instruments can feasibly be limited to once for each patient and then thrown away. A suggestion that properly decontaminated and treated re-use of instruments, such as those in Dr. Jackson's case, is a criminal violation is not warranted by medical science or the applicable law. Physicians and health care facilities, including but not limited to Dr. Jackson, have sterilization and decontamination processes in place to allow reuse of the same instruments on multiple patients in operating rooms across every ambulatory surgery center and hospital.  It is *Amicus'* position that it is overreach and a misinterpretation of the applicable law to base a prosecution on mere reuse.

An analogous example that will illustrate the issue for the court is that of colonoscopy and the use of colonoscope to perform colonoscopy is

illuminating. Each year in the United States, there are more than 15 million colonoscopies and 7 million upper-GI endoscopies, known as esophagogastroduodenoscopies, or EGDs. *Infection Rates After Colonoscopy, Endoscopy at US Specialty Centers Are Far Higher Than Previously Thought | Johns Hopkins Medicine*.

Colonoscopes, like sinus scopes, are used and reused repeatedly by gastroenterologists in surgical centers across this country where the devices undergo a decontamination process in between patients. *See Colonoscopy - Mayo Clinic: "During a colonoscopy, a long, flexible tube (colonoscope) is inserted into the rectum. A tiny video camera at the tip of the tube allows the doctor to view the inside of the entire colon."*[3] There are insufficient numbers of scopes for them to be single-use, and therefore they are reused after decontamination. According to the prosecutors in this case, those doctors can be subject to criminal indictment and face twenty-five (25) years, as well. The analysis in Dr. Jackson's case can be

---

[3] *See*, Mayo Clinic, *Overview, Colonoscopy*, https://www.mayoclinic.org/tests-procedures/colonoscopy/about/pac-20393569#:~:text=A%20tiny%20video%20camera%20at,inside%20of%20the%20entire%20colon
.

analogized to the use and reuse of colonoscopes, and an examination of Dr. Jackson's decontamination and treatment of sinus scopes between uses should have been required prior to criminalizing the conduct of "re-using" the sinus scopes.

Dr. Jackson was convicted and is serving a twenty-five (25) year sentence because she properly used an approved device to treat her patients differently than the FDA label instructed. In Dr. Jackson's medical judgment, the device could be cleaned and reused. Dr. Jackson is not unique. Hospitals reuse devices labeled as single use and there is no evidence that the sanitized devices are less effective or safe. Moreover, no such evidence was able to be presented by the government through testimony of any expert witness.

In this case, the record shows that Dr. Jackson was prohibited from presenting the decontamination process to show how properly the scopes were being processed in between patients. As such the issue of decontamination was not properly presented to the jury, and the jury was left with the impression that mere showing by the federal prosecutors that there was "re-use" was all that was required to convict. That undercuts every scientific and medical principle.

## II.     THE FDA IS NOT AUTHORIZED TO REGULATE THE PRACTICE OF MEDICINE

Congress enacted 21 U.S.C. § 396 to ensure that FDA is not regarded as a source that controls the standard of care in medical practice. "[N]othing in this chapter shall be construed to limit or interfere with the authority of a health care practitioner to prescribe or administer any legally marketed device to a patient for any condition or disease within a legitimate health care practitioner-patient relationship." 21 U.S.C. §396.

*Amicus* submits that Section 396 prohibits the FDA from recommending for or against the off-label use of any drug or device to any health care practitioner. Because the FDA is prohibited, the federal prosecutors are also prohibited in assigning the role to FDA as an entity that dictates how a product or a drug is to be used by a health care practitioner. That process is regulated by state medical boards.

In the most recent ruling out of the Fifth Circuit regarding FDA's role with respect to providing medical advice to health care practitioners, the Fifth Circuit Court of Appeals stated that "Nothing in the Act's plain text authorizes FDA to issue medical advice or recommendations." *Apter*

*v. Dep't of Health & Hum. Servs.*, [80 F.4th 579, 589](#) (5th Cir. 2023). Yet, the prosecutors in Dr. Jackson's case accused her criminally because she did not communicate to her patients the FDA's recommendation regarding the use of a medical device. No expert and no representative of the North Carolina Medical Board testified that off -label use of sinus scopes for the purpose of dilatation of sinus cavities where the scopes were decontaminated and then re-used was a departure from the standard of care. No evidence was presented in that regard.

*Apter* reaffirms that the FDA cannot regulate the practice of medicine. In *Apter*, at issue were "Posts" that were issued by FDA on Twitter which essentially went to the heart of practice of medicine which the three plaintiff physicians took issue with in bringing the declaratory judgment action against FDA. The Fifth Circuit described these "Posts" as containing information, like "Should Not Use Ivermectin to Treat or Prevent COVID-19." The Fifth Circuit characterized this post as aiming to curb future action—not just label past action. The product label for the sinus scopes stating "single-use only" aims to curb "future action" by the health practitioner; however, such labeling cannot restrict medical judgment or regulate the practice of medicine. In Dr. Jackson's case, the

prosecution amounts to ceding to the FDA the power to determine medical standard of care. That is contrary to the *Apter* and other cases, such as *United States v. Caronia*, <u>703 F.3d 149, 153</u> (2d Cir. 2012) holding that the FDCA, does not prohibit doctors from prescribing an FDA-approved drug, to wit, a chemotherapy drug approved to treat leukemia, or an "off-label" use (e.g., treatment of other cancers); *Dent v. West Virginia*, <u>129 U.S. 114, 121</u>–24, <u>9 S.Ct. 231</u>, <u>32 L.Ed. 623</u> (1889), holding that the FDCA instead leaves the *regulation of doctors to the states* and *Buckman Co. v. Plaintiffs' Legal Comm.*, <u>531 U.S. 341, 350</u>–51, (2001), holding that although the Act regulates a manufacturer's distribution of drugs, it does not go further by regulating a doctor's practice of medicine. It is clear from the case law that the ultimate entity that is regulated by the FDA are drug manufacturers relating to how they package the drugs, or as in this case how they package surgical instruments, how they label these products and how they transport these products. Excluded from that authority is the power to regulate the practice of medicine insofar as how these surgical instruments or drugs are to be administered by physicians. The entity regulating this conduct is always the state medical licensing boards.

## III. NO STATE LAW DETERMINATION HAS BEEN MADE THAT REUSE IN THIS CASE WAS ILLEGAL OR CONTRARY TO MEDICAL JUDGMENT

There is no federal regulation of the practice of medicine. Regulation of the practice of medicine is reserved for the states and states are the sole entities empowered to police the practice of medicine.

The North Carolina Medical Board is statutorily authorized "to regulate the practice of medicine and surgery for the benefit and protection of the people of North Carolina." *N.C. Gen.Stat. § 90–2* (2005). The Board has the power "to deny, annul, suspend, or revoke [the] license" of a license-holder found by the Board to have committed:

> [u]nprofessional conduct, including, but not limited to, departure from, or the failure to conform to, the standards of acceptable and prevailing medical practice, or the ethics of the medical profession, irrespective of whether or not a patient is injured thereby, or the committing of any act contrary to honesty, justice, or good morals, whether the same is committed in the course of the physician's practice or otherwise, and whether committed within or without North Carolina.

*N.C. Gen.Stat. § 90–14(a)(6)* (2005).

Board is an occupational licensing agency, which is governed by Article 3A of the North Carolina Administrative Procedure Act. *See N.C. Gen.Stat. § 150B–2(4b)* (2005). The FDA is not similarly empowered.

Under the applicable state law, the North Carolina Medical Board has not found that reuse of sinus scopes is a violation of any rule or regulation of the practice of medicine.

Based on North Carolina Medical Board's statutory powers to regulate the practice of medicine, prosecutors were required to obtain either an advisory opinion or a declaratory statement from the North Carolina Medical Board before pursuing criminal charges against Dr. Jackson. Had they done this necessary investigation, then and only then could a criminal case be potentially brought if there was departure from the standard of care. Moreover, this step of inquiry from the North Carolina Medical Board was necessary so the government could understand the difference between the small, flexible and mobile sinus scopes with the smaller mobile video viewing system vs. the large, bulky and immobile scopes with the large bulky immobile video viewing system. Refurbished - Olympus EVIS EXERA III Endoscopy System - Avante Health Solutions (avantehs.com) vs. E-SteriScope™ Single-use Rhinolaryngoscope | Olympus America | Medical. Dr. Jackson testified about how mobile her practice had become and that she would travel to different underserved areas to perform the balloon sinusotomies- and for

that she absolutely needed the use of the small, flexible mobile scopes with the smaller video viewing system, which the FDA had labeled as "single use." JA3022-3023. Reading the government's case, the prosecutors appear not to have distinguished the realities of an ENT surgeon who was delivering health care on the go. An advisory opinion from the North Carolina Medical Board might have assisted in this matter, to ground the prosecutorial decisions in science and medical principles. Instead, the prosecution was based on misinterpretations of both the law and the medical science.

The prosecution in this case may be analogized to prosecutions of physicians pursuant to 21 U.S.C. §841 on charges of improper prescribing of controlled substances. For nearly two decades, federal prosecutions involving 841 violations have been based on algorithm-dependent data to show that physicians were prescribing controlled substances outside the scope of their professional practice, despite being written in the course of legitimate doctor-patient relationship. *Amicus* was formed in part after learning that hundreds of physicians charged with 841 violations were being sent to prison with decades long sentences over a misinterpretation, overreach and lack of proper prosecutorial inquiry

from the corresponding state medical licensing entities. That is until June 2022, when the United States Supreme Court in a 9-0 unanimous decision ruled that the federal prosecutors were improperly ignoring the "Except as otherwise authorized" phrase in the text of Section 841, eliminating *mens rea* in prosecutions involving 841 charges against physicians who hold DEA certificates authorizing them to prescribe controlled substances. *Ruan v. United States* 142 S.Ct. 2370 (2022).

Absent the *Ruan* clarification by the United States Supreme Court, the trend of incarceration of physicians in such cases would have continued, based on a misinterpretation, overreach and lack of proper self-education on the subject by federal prosecutors. The same pattern of overreach is evident in Dr. Jackson's case. If her conviction stands, then this Court would essentially be deeming the FDA as the proper authority to determine the way medicine is practiced in this country, contravening more than eight (8) decades of precedent that FDA does not regulate, dictate or direct the use or re-use of any instrument or drug by health care practitioners.

## IV.  THE TRIAL COURT IMPROPERLY LIMITED DR. JACKSON'S ABILITY TO PRESENT HER DEFENSE AND RESTRICTED HER ABILITY TO PRESENT THE REUSE PROCESS AND ITS COST TO THE JURY

The district court in Dr. Jackson's case inexplicably accused Dr. Jackson of "greed." At the same time, the trial court recognized that there was no evidence of any harm to any patient.  The trial court described the trial evidence as establishing that Dr. Jackson "reused single-use devices."  The court then expressed its belief that reusing devices labeled for single use was "shameful" and showed that she was "consumed by greed."  Because the prosecutors had not done their homework as to how the single use scopes can be re-used under acceptable medical standard, the district court judge was making conclusions without sufficient evidence on the scientific principles that were at the core of Dr. Jackson's practice.

No information was presented to the court at trial regarding the costs associated with the decontamination and re-use process.  Dr. Jackson cannot be rationally determined to have acted with shameful greed, if no determination was made as to the costs and expenses otherwise incurred in the re-use process Absent weighing of the costs and

benefits of single-use versus reuse, judgments such as "greed" and "shame" are not based on substantial evidence in the record.

To expand on the alternative to single use, and the manner in which devices are prepared for reuse, the Court should note that a Glutaraldehyde Solution is used in decontamination processes. The solution is poured into a stainless steel container and sinus scopes are immersed into the solution for a period of time up to ninety (90) minutes. One medical supply company describes this solution as "used for high level disinfection, or as an alternative method of sterilization when other chemical sterilants are not sufficient. The solution has *bactericidal, tuberculocidal, fungicidal and virucidal properties*. The Glutaraldehyde Solution is described as non-corrosive, ideal for use on heat sensitive medical equipment and instruments. The cost of this solution can be substantial. *See, e.g.,* [REGIMEN - Glutaraldehyde High-Level Disinfectant Activation Required L — Serfinity Medical](#).

Moreover, the aforementioned solution is toxic and cannot just be poured down a drain in disposal, requiring the purchase of another agent that is a neutralizing chemical agent to properly dispose of the Glutaraldehyde solution. This neutralizing chemical agent is known as

*OPA Glutaraldehyde Neutralizer Hyde online (medicalproductssupply.com)* and such chemicals are a significant expense. Each bottle of the neutralizing agent neutralizes two (2) gallons of the Glutaraldehyde solution which, as stated above, is the solution that the sinus scopes are immersed in. The manufacturer explains that this chemical is the neutralizing agent for glutaraldehyde and OPA high level disinfectant/sterilant solutions and as one that converts the solutions into non-toxic, non-hazardous waste so that the solutions can be poured down drains. Other descriptions of the neutralizing agent are as follows:

- Once neutralized, solutions may be safely washed down the drain

- Fast acting - 5 minutes to complete neutralization

- Each bottle neutralizes up to 2 gallons of glutaraldehyde or 16 gallons of OPA. See, e.g. *OPA Glutaraldehyde Neutralizer Hyde online (medicalproductssupply.com)*

The sinus scopes which were being used by Dr. Jackson required at least one gallon of the Glutaraldehyde solution in order for the scope to be able to get immersed and at least one bottle of the neutralizing agent which together, for each scope cost, significant sums. Depending on the number of sinus scopes used on a given day, the total cost of "reuse" could

reach thousands of dollars per day. This out-of-pocket expense was not charged to health care insurers, as the government did not present any billing evidence for this decontamination process that required a costly means for disposal of the decontamination fluid.

The Fifth and Sixth Amendments to the United States Constitution requires that Dr. Jackson be allowed to present her complete defense. When the trial court refused to allow Dr. Jackson to demonstrate her cleaning process along with the costs/expenses/burden thereof, and prohibited her from informing the jury of the CDC guidelines that her cleaning process followed, she was erroneously limited in her defense. The trial court also excluded a CDC document Dr. Jackson relied upon to form her belief that her conduct was allowable (which showed that 20-30 percent of hospitals re-use devices labeled as "single use" devices).

The cleaning, decontamination and reuse process was not presented to the district court based on the district court's exclusion. And, without record evidence, the district court judge had, therefore, no basis to describe Dr. Jackson as "greedy" asserting that Dr. Jackson was reusing the devices purely out of financial self-interest when in fact Dr. Jackson was incurring out of pocket expenses for the decontamination

process and the smaller scopes were needed to accommodate performing these procedures at other locations.  And, likewise, the trial court had no basis for unduly limiting her ability to present a defense in this case.

## CONCLUSION

*Amicus* urges this Court to recognize that the criminalization of the legitimate practice of medicine at the federal level is an important factor to be considered in reviewing this case. For all the foregoing reasons, and to avoid a flood of federal criminal litigation as in pre-*Ruan*, *Amicus* respectfully requests this Court to reverse Dr. Jackson's judgment and sentence and remand with instructions that any re-trial must necessarily include expert witness and scientific evidence by the government that re-use of single-use sinus scopes along with appropriate decontamination procedures departs from any acceptable legitimate medical purpose.

Respectfully submitted,

*/s/ Eric O. Husby*
Eric O. Husby, Esq.
3632 Land O Lakes Blvd, Suite 105-8
Land O Lakes, FL 34639
PH: 813.597.8181
ehusby@husbylegal.com
*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7), I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because this brief contains 3,988 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Century Schoolhouse 14-point font using Microsoft Word 2022.

*/s/ Eric O. Husby*
ERIC O. HUSBY, ESQ.

## CERTIFICATE OF SERVICE

I hereby certify that on April 18, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system. Those who are not registered

CM/ECF users will be served by First Class Mail.


Dated: April 18, 2024

/s/ Eric O. Husby

ERIC O. HUSBY, ESQ